**LAWRENCE G. WASDEN**
ATTORNEY GENERAL
STATE OF IDAHO

**BRETT DELANGE** (ISB #3628)
Division Chief
Consumer Protection Division

**JANE HOCHBERG** (ISB #5465)
**SCOTT ZANZIG** (ISB #9361)
Deputy Attorneys General
IDAHO OFFICE OF THE ATTORNEY GENERAL
954 West Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720–0010
Tel: 208.334.2400
Fax: 208.334.4151
brett.delange@ag.idaho.gov
jane.hochberg@ag.idaho.gov
scott.zanzig@ag.idaho.gov

*Attorneys for State of Idaho*

**ROBERT S. LIBMAN** (*pro hac vice*)
MINER, BARNHILL & GALLAND P.C.
325 North LaSalle Street, Suite 350
Chicago, Illinois 60654
Tel: 312.751.1170
Fax: 312.751.0438
rlibman@lawmbg.com

**JAY EDELSON** (*pro hac vice*)
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
jedelson@edelson.com

[Additional counsel listed on the signature page.]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STATE OF IDAHO, through ATTORNEY GENERAL LAWRENCE G. WASDEN, <br><br> *Plaintiff*, <br><br> v. <br><br> MALLINCKRODT PLC, MALLINCKRODT LLC, JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC., TEVA PHARMACEUTICALS USA INC., CEPHALON, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., ENDO INTERNATIONAL PLC, ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS INC., | Case No.: <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

MCKESSON CORPORATION,
CARDINAL HEALTH, INC., and
AMERISOURCEBERGEN DRUG
CORPORATION,

        *Defendants*.

The State of Idaho, by and through Attorney General Lawrence G. Wasden, brings this

Complaint and Demand for Jury Trial against Mallinckrodt plc, Mallinckrodt LLC, Janssen

Pharmaceuticals, Inc., Johnson & Johnson, Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen

Pharmaceutica, Inc., Teva Pharmaceuticals USA Inc., Cephalon, Inc., Teva Pharmaceutical

Industries, Ltd., Endo International plc, Endo Health Solutions Inc., and Endo Pharmaceuticals

Inc. (collectively, "Manufacturer Defendants" or "Manufacturers"), and McKesson Corporation,

Cardinal Health, Inc., and AmerisourceBergen Drug Corporation (collectively, "Distributor

Defendants" or "Distributors"), and alleges as follows:

## NATURE OF THE ACTION

1.      Prescription opioids are devastating communities throughout the country. In 2015,

over two million Americans had a substance abuse disorder involving prescription opioids. In the

last two decades, there have been more than 351,000 reported opioid-related deaths in the United

States, increasing from approximately 8,000 in 1999 to more than 47,000 in 2017. Since then, the

White House declared the opioid crisis a public health emergency. It has been described as the

worst drug epidemic in American history.

2.      The State of Idaho has not been spared. Between 1999 and 2017, Idaho's opioid-

related death rate nearly tripled. In 2015, approximately 1.3 million opioid prescriptions were

written in Idaho—nearly one prescription for every person in the State. As a result, Idaho's

opioid addiction rate is now higher than that of most other states in the country. Between 2015

COMPLAINT - 2

and 2016, Idaho ranked 5th among the 50 states for pain reliever misuse among individuals aged 12 and older. In 2019, Idaho Governor Brad Little issued an Executive Order creating the Opioid and Substance Use Disorder Advisory group to help combat the opioid crisis.

3.      This crisis and its consequences could and should have been avoided. Unfortunately, Defendants—opioid manufacturers and distributors—created and then executed a nearly two-decade long scheme that allowed vast quantities of opioids to flow freely to communities throughout the country and within the State of Idaho, for their own commercial profit and gain.

4.      The crux of Defendants' misconduct involved a campaign that started in the late 1990s that sought to make sweeping changes to the public's and medical community's perception of opioids, that both downplayed the risks associated with opioid use and aggressively encouraged much broader use of the drugs than ever intended. This marketing campaign, in turn, misled and deceived doctors into prescribing more of the Manufacturer Defendants' opioids, in increasingly dangerous doses, and for longer periods of time, while persuading doctors and patients alike to forego safer alternatives. These efforts led to a dramatic increase in opioid prescriptions, which in turn led to a dramatic rise in opioid abuse, addiction, overdose, death, and diversion from legitimate users to illicit use.

5.      The Manufacturer Defendants executed this campaign throughout Idaho, deploying their sales forces to market and promote their dangerous opioids to Idaho doctors and pharmacists tens of thousands of times with false, misleading, and deceptive statements about the benefits and risks of these drugs. The Manufacturer Defendants purposefully and aggressively marketed opioid products for unapproved uses, buried unfavorable research, and employed networks of phony front groups, opinion leaders, and sales representatives to expand the market

for opioids and obtain massive profits. Even when the Manufacturer Defendants knew that a staggering number of people were overdosing on their drugs throughout Idaho, they continued to target doctors and patients with false information in order to sell more of their drugs and reap more revenue and profit.

6.     Further down the supply chain, the Distributor Defendants had a duty to serve as a check on the diversion and misuse of prescription opioids by, among other ways, implementing appropriate monitoring systems to identify "red flags" in opioid ordering. But the Distributor Defendants disregarded this duty, failing to implement even remotely adequate controls to prevent opioid diversion that subsequently (and foreseeably) became widespread throughout the State of Idaho. Instead of serving as gatekeepers, the Distributor Defendants pursued enormous profits by keeping open the gates and looking the other way, as millions of doses of prescription opioids flooded into communities throughout the State of Idaho.

7.     Defendants' indifference has taken a dramatic toll on the State of Idaho. The opioid crisis has, among other things, led to significant loss of life, drug abuse, addiction, overdose, and crime, that were caused by Defendants' illicit activities and have imposed, and will continue to impose, tremendous social and economic costs on the State of Idaho.

8.     The tragic loss of life and heartbreaking impact on families from this epidemic is only one aspect of Idaho's opioid crisis. Idaho has spent significant taxpayer money to combat opioid abuse and addiction, including substantial excess expenditures on law enforcement, criminal justice, treatment, and emergency medical services. It has also spent taxpayer dollars paying for opioids that would not have been prescribed but for Manufacturers' deceptive marketing campaigns and Distributors' abandonment of their duties and responsibilities.

COMPLAINT - 4

9.      These injuries were a direct and foreseeable consequence of Defendants'
misconduct.

10.      The State of Idaho, through Attorney General Lawrence G. Wasden, brings this
lawsuit to stop Defendants' unlawful practices, protect the people of Idaho from further harm,
recover restitution, damages and civil penalties from Defendants for their unlawful conduct, and
require the Defendants to pay for the costs the State has incurred and will continue to incur to
abate the harm the Defendants foreseeably caused.

## PARTIES

### I.      Plaintiff State of Idaho.

11.      Attorney General Lawrence G. Wasden brings this action in the public interest in
the name of Plaintiff State of Idaho and in the State's sovereign capacity.

### II.      Manufacturer Defendants.

#### A.      Mallinckrodt.

12.      Defendant Mallinckrodt plc is an Irish public limited company with its
headquarters in the United Kingdom. Within the United States, Mallinckrodt plc operates under
the name Mallinckrodt Pharmaceuticals, and maintains its U.S. headquarters in St. Louis,
Missouri.

13.      Defendant Mallinckrodt LLC is a Delaware limited liability company with its
principal place of business located in St. Louis, Missouri. Mallinckrodt LLC is a wholly owned
subsidiary of Mallinckrodt plc.

14.      Defendants Mallinckrodt plc and Mallinckrodt LLC are collectively referred to as
"Mallinckrodt."

15.     At all times relevant to this Complaint, Mallinckrodt has been in the business of manufacturing, advertising, promoting, marketing, selling and/or distributing prescription opioids throughout the United States, including in Idaho.

**B.     Janssen.**

16.     Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business located in Titusville, New Jersey.

17.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business located in New Brunswick, New Jersey.

18.     Janssen Pharmaceuticals, Inc. is a wholly owned subsidiary of Johnson & Johnson, which controls the sale and development of Janssen Pharmaceuticals, Inc.'s drugs.

19.     Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with a principal place of business located in Titusville, New Jersey.

20.     Defendant Janssen Pharmaceutica, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business located in Titusville, New Jersey.

21.     Defendants Janssen Pharmaceuticals, Inc., J&J, OMP and Janssen Pharmaceutica, Inc. are collectively referred to as "Janssen."

22.     At all times relevant to this Complaint, Janssen has been in the business of manufacturing, advertising, promoting, marketing, selling and/or distributing prescription opioids throughout the United States, including in Idaho.

COMPLAINT - 6

**C.     Teva.**

23.     Defendant Teva Pharmaceuticals USA Inc. ("Teva USA") is a Delaware corporation with its principal place of business located in Parsippany, New Jersey.

24.     Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business located in Frazer, Pennsylvania.

25.     Defendant Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is an Israeli limited liability company with its principal place of business located in Petah Tikvah, Israel, and is the parent company of Teva USA. In 2011, Teva Ltd. acquired Cephalon.

26.     Defendants Teva USA, Cephalon, and Teva Ltd. are collectively referred to as "Teva."

27.     At all times relevant to this Complaint, Teva has been in the business of manufacturing, advertising, promoting, marketing, selling and/or distributing prescription opioids throughout the United States, including in Idaho.

**D.     Endo.**

28.     Defendant Endo International plc is an Irish public limited company, with its global headquarters located in Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania. Endo International plc operates in the U.S. as Endo Pharmaceuticals.

29.     Defendant Endo Health Solutions Inc. ("EHS") is a Delaware corporation with its principal place of business located in Malvern, Pennsylvania. EHS is a wholly owned subsidiary of Endo International plc.

30.     Defendant Endo Pharmaceuticals Inc. ("EPI") is a wholly owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

31.     Defendants Endo International plc, EHS and EPI are collectively referred to as "Endo."

32.     At all times relevant to this Complaint, Endo has been in the business of manufacturing, advertising, promoting, marketing, selling and/or distributing prescription opioids throughout the United States, including in Idaho.

### III.     Distributor Defendants.

#### A.     McKesson.

33.     Defendant McKesson Corporation is a Delaware corporation, with its principal place of business located in San Francisco, California. At all times relevant to this Complaint, Defendant McKesson has been in the business of distributing pharmaceutical drugs, including opioids, throughout the United States, including the State of Idaho.

#### B.     Cardinal.

34.     Defendant Cardinal Health, Inc. is an Ohio corporation with its principal place of business located in Dublin, Ohio. At all times relevant to this Complaint, Defendant Cardinal has been in the business of distributing pharmaceutical drugs, including opioids, throughout the United States, including the State of Idaho.

#### C.     AmerisourceBergen.

35.     Defendant AmerisourceBergen Drug Corporation is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. At all times relevant to this Complaint, Defendant AmerisourceBergen has been in the business of distributing pharmaceutical drugs, including opioids, throughout the United States, including the State of Idaho.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction over the subject matter of this action, and personal

jurisdiction over each Defendant, pursuant to 28 U.S.C. § 1331 because this action arises under

the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO"),

which is a federal statute. This Court has supplemental jurisdiction over Plaintiff's state law

claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims

that they form part of the same case or controversy under Article III of the United States

Constitution.

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### I.     Opioids Are Highly Addictive, Inappropriate for Long-Term Use, and Deadly.

38.     Opioids are a class of drugs and analgesic (*i.e.*, pain-relieving) agents that include

prescription pain relievers such as oxycodone, hydrocodone, codeine, morphine, and fentanyl, as

well as the illegal drug heroin. Upon ingestion, opioids attach to specific proteins called "opioid

receptors," which are distributed throughout the body's central nervous system. When activated,

these receptors produce analgesic effects and a sense of euphoria in the user.[1]

39.     Opioids are highly addictive. Repeated exposure to escalating dosages of opioids

alters the brain so that it functions more or less normally when the drugs are present and

abnormally when they are not. As time goes by, the opioid user needs more and more opioids to

feel "normal," produce pleasure comparable to prior opioid uses, and avoid any negative

symptoms of withdrawal.

---

[1]     *See* Hasan Pathan & John Williams, *Basic Opioid Pharmacology: An Update*, 6 British J. of Pain 11 (2012).

40.     Accordingly, opioid use can readily lead to misuse, dependence, and abuse. Untreated, opioid addiction can be deadly. Opioids restrict breathing and can ultimately lead to asphyxiation.[2] People who take opioids at high doses and for longer periods of time face increasing risk of addiction, overdose, and death.[3]

41.     Opioids have a demonstrated, scientifically-proven use in treating acute cancer-related pain, and the short-term prescription of opioids for that purpose has, for years, been part of the medical consensus.[4]

42.     On the other hand, the efficacy of long-term opioid use for chronic non-cancer pain has never been reliably demonstrated through sufficient evidence or high-quality scientific research.[5]

---

[2]     Laura Sanders, *Opioids kill. Here's how an overdose shuts down your body*, Sci. News, https://www.sciencenews.org/article/opioid-crisis-overdose-death (last visited July 22, 2019).

[3]     *Opioid Prescribing*, U.S. Dep't of Health and Human Servs. Centers for Disease Control and Prevention, https://www.cdc.gov/vitalsigns/opioids/index.html (last visited July 22, 2019).

[4]     Hasan Pathan & John Williams, *Basic Opioid Pharmacology: An Update*, 6 British J. of Pain 11, 15 (2012). Opioids' use as a predictable, effective source of short-term pain relief has even been called into question. A 2004 meta-analysis of literature published between 1996 and 2003 on opioids and pain relief found that, in patients taking doses for periods of up to eight weeks, opioid use only reduced reported pain by 2 points on a "1 to 10" pain scale, or a 30 percent reduction of pain compared to patients taking placebos. For some conditions, opioids provided either an insignificant reduction in pain over a placebo or failed to provide at least a 30% reduction in pain. Thus, Dr. Andrea Rubinstein, MD, concludes that even short-term opioid efficacy is a "far cry from the 'complete relief' expected by many patients." *See* Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Mag. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747; *see also* Eija Kalso, et al., *Opioids in Chronic Non-Cancer Pain: Systemic Review of Efficacy and Safety*, 21 PAIN 372 (2004).

[5]     *Id.*

43.     As one 2006 study bluntly found: "it is remarkable that opioid treatment of chronic non-cancer pain *does not seem to fulfill any of the key outcome goals: pain relief, improved quality of life, and improved functional capacity*."[6]

44.     Nevertheless, over the last two decades "opioids [have been] frequently prescribed within the [medical] community, where codeine, oxycodone and buprenorphine are commonly used for chronic pain treatment."[7]

45.     As described below, this did not occur by chance. Manufacturer Defendants drove the rapid and deadly expansion of opioid prescriptions for chronic pain treatment by engaging in a deliberate marketing campaign to deceive doctors, patients, and the public, and Distributor Defendants abandoned their duties and responsibilities and flooded communities with these dangerous drugs, all for the purpose of generating enormous revenues and profits.

## II.     Manufacturer Defendants Orchestrated Complex and Deceptive Marketing Campaigns Designed to Mislead Doctors and Patients About Opioids.

46.     For decades, doctors had reserved notoriously-addictive opioids for treating short-term severe cancer pain and for patients who were terminally ill. But the Manufacturer Defendants ignored history and science in a quest for increased revenue and profits. To do so, the Manufacturer Defendants made the deliberate decision to expand the opioid marketplace by convincing doctors, patients, and the public that its opioids were safe and appropriate for treating a broader group of patients. These patients are not only ill-suited for opioid treatment to begin with, but also far more likely to become addicted and suffer harm from their long-term use.

---

[6]     Jorgen Eriksen, et al., *Critical Issues on Opioids in Chronic Non-Cancer Pain: An Epidemiological Study*, 125 Pain 172, 176–77 (2006) (emphasis added).

[7]     Hasan Pathan & John Williams, *Basic Opioid Pharmacology: An Update*, 6 British J. of Pain 11, 15 (2012).

47.     The Manufacturer Defendants' marketing campaigns minimized or failed to disclose the known risks of opioids and misrepresented their benefits. In doing so, the Manufacturer Defendants sought to cause doctors to prescribe, and patients to take, more of their opioid products, in larger and more dangerous doses, and for longer periods of time, while at the same time foregoing safer alternatives. The Manufacturer Defendants' goal was simple: reverse the popular medical understanding of opioids and their risks so they could sell more of their products and reap the profits.

48.     The Manufacturer Defendants' efforts were successful. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected the opioid epidemic (calling it an "urgent health crisis") to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."[8]

49.     As described below, Manufacturer Defendants spent hundreds of millions of dollars and utilized numerous channels to push this industry-wide deceptive marketing campaign.

**A.     An Overview of the Manufacturer Defendants' Industry-Wide Deceptive Marketing Campaign.**

50.     Beginning in the 1990s, the Manufacturer Defendants collectively created and began disseminating misleading, unfair, and/or false messages about opioids.

51.     Generally speaking, the Manufacturer Defendants' misleading, unfair, and/or false messaging about opioids fell within the following ten categories:

▪   Downplaying the risk of addiction to opioids;

---

[8]     Letter from Vivek H. Murthy, U.S. Surgeon General (Aug. 2016); *available at*, http://i2.cdn.turner.com/cnn/2016/images/08/25/sg.opioid.letter.pdf.

- Failing to disclose the greater risks of prolonged opioid use;

- Promoting the concept of "pseudoaddiction;"

- Failing to disclose the risks of prescribing and using higher opioid doses;

- Failing to disclose the difficulties associated with terminating opioid treatment;

- Promoting the concept that opioids improve function and quality of life;

- Promoting certain opioids as "abuse-deterrent" when they were not;

- Promoting the purported efficacy of extended-release ("ER") opioids;

- Criticizing safer alternatives to opioids; and

- Promoting opioids to vulnerable populations.

52.     As detailed in Section II.D. below, each Manufacturer Defendant individually engaged in misconduct that falls within at least several of these categories, and some engaged in misconduct that falls within nearly all of them. As described below, each message was contrary to scientific evidence.

> 1.   _Downplaying the risk of addiction to opioids._

53.     The Manufacturer Defendants made false, deceptive, and misleading statements about the risk of addiction to opioids, stating and implying that opioids "are not addictive." The Manufacturer Defendants also sought to shift the blame for addiction to patients, pushing and promoting a narrative that addiction is a character flaw that would not occur to patients who took personal responsibility.

54.     Such claims were contrary to scientific evidence. The Centers for Disease Control and Prevention has explained in its opioid-prescribing guideline (the "2016 CDC Guideline") that there is "[e]xtensive evidence" of the "possible harms of opioids (including opioid use

disorder [an alternative term for opioid addiction], [and] overdose . . . .).["9] The 2016 CDC Guideline states that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[10] The U.S. Food and Drug Administration ("FDA") has also echoed this claim, stating that "most opioids have 'high potential for abuse.'"[11] According to the 2016 CDC Guideline, which simply confirmed earlier scientific findings, up to 26% of people who are prescribed opioids become addicted.[12] In 2016, the U.S. Surgeon General issued a report stating that "addiction is a health condition, not a moral failing or character flaw."

> 2.    *Failing to disclose the greater risks of prolonged opioid use.*

55.    The Manufacturer Defendants failed to disclose the greater risk of addiction from prolonged use of opioids.

56.    This omission deliberately ignored contrary scientific evidence. As the FDA has stated: because of the "known serious risks" associated with long-term opioid use, including risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater

---

[9]      Deborah Dowell, et al., *CDC Guideline for Prescribing Opioids for Chronic Pain— United States*, 2016, Morbidity & Mortality Wkly. Rep., Mar. 18, 2016, at 15 *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[10]      *Id*. at 2, 25.

[11]      Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Kolodny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), http://paindr.com/wp-content/uploads/2013/09/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Presc ribing_Partial_Petition_Approval_and_Denial.pdf.

[12]      2016 CDC Guideline, *supra* note 9.

risks of overdose and opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have proved inadequate.[13]

### 3.    *Promoting the concept of "pseudoaddiction."*

57.    The Manufacturer Defendants falsely stated that signs of addiction are actually signs of untreated pain, and that the appropriate treatment was to prescribe more and higher doses of opioids. As part of this campaign, the Manufacturer Defendants promoted the concept of "pseudoaddiction," which they characterized as a patient's reaction to an insufficient opioid prescription. Specifically, the Manufacturer Defendants claimed that patients with unrelieved pain may become focused on obtaining medications and may even partake in illicit drug use or deception to find relief, but that such behavior was simply "pseudoaddiction," and resolvable through a more intensive prescription. As part of this effort, the Manufacturer Defendants peddled the false notion that addiction was misunderstood and the labeling a patient as an addict results in unnecessary withholding of opioids.

58.    Such claims were contrary to scientific evidence. As one recent independent scientific report concluded: "[W]e find no empirical evidence yet exists to justify a clinical "diagnosis" of pseudoaddiction . . . The renaming of pain with a term that essentially means "fake addiction" and serves to dismiss addiction as part of the clinical differential diagnosis is a construct that *is conspicuously and uniquely attached to opioid therapies which are extremely*

---

[13]    Letter to Application Holders Regarding ER/LA Opioid Analgesic Class Labeling Changes and Postmarket Requirements, FDA, *available at* https://www.fda.gov/media/86875/download.

*addictive analgesics, among many other effective, evidence-based strategies for analgesia that are far less addictive.*[14]

        4.    <u>*Failing to disclose the risks of prescribing and using higher opioid doses.*</u>

59.     The Manufacturer Defendants falsely claimed that opioid dosage could be increased without added risk and failed to disclose the greater risk to patients of higher doses.

60.     Such claims were contrary to scientific evidence. As the 2016 CDC Guidelines makes clear: "[b]enefits of high-dose opioids for chronic pain are not established" while the risks for serious harms related to opioids therapy increase at high opioid dosage."[15] More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[16]

        5.    <u>*Failing to disclose the difficulties associated with terminating opioid treatment.*</u>

61.     The Manufacturer Defendants failed to disclose the increased difficulty of terminating opioid treatment after long-term use, and the associated withdrawal symptoms. They instead disseminated the false and deceptive message that physical dependence is separate from addiction and that withdrawal symptoms could be managed by gradually tapering dosages.

62.     Such claims were contrary to scientific evidence. The 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limited" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in

---

[14]     Greene MS, Chambers RA. Pseudoaddiction: Fact or Fiction? An Investigation of the Medical Literature. *Curr Addict Rep*. 2015; 2(4): 310–317, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4628053/ [emphasis added].

[15]     2016 CDC Guideline, *supra* note 9, at 22–23.

[16]     *Id.* at 23–24.

patients exposed to opioids for more than a few days." The Guideline further states that "tapering

opioids can be especially challenging after years on high dosages" and highlights the difficulties,

including the need to carefully identify "a taper slow enough to minimize symptoms and signs of

opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The

CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of

different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

> 6.   *Promoting the concept that opioids improve function and quality of life.*

63.   The Manufacturer Defendants falsely claimed that long-term opioid use improved

patients' function and quality of life.

64.   Such claims were contrary to scientific evidence. In 2016, the CDC concluded

that "there is no good evidence that opioids improve pain or function with long-term use," and

that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for

chronic pain are uncertain, risks associated with long-term opioid use are clearer and

significant." According to the CDC, "for the vast majority of patients, the known, serious, and

too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic

pain]." As the CDC Guideline also makes clear, "[n]o evidence shows a long-term benefit of

opioids in pain and function versus no opioids for chronic pain with outcomes examined at least

1 year later (with most placebo-controlled randomized trials [equal to or less than] 6 weeks in

duration)" and that other treatments were more or equally beneficial and less harmful than long-

term opioid use.[17]

---

[17]    Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S.
Food and Drug Admin., U.S. Dep't of Health and Human Servs., to Robert Balio, Vice
President, Reg. Affairs, Endo Pharm. Inc. (May 10, 2013), at 15.

7.     *Promoting certain opioids as "abuse-deterrent" when they were not.*

65.    The Manufacturer Defendants deceptively marketed "abuse-deterrent" formulations of their opioids in order to create the false impression that such properties can reduce abuse and risk of addiction.

66.    Such claims were contrary to scientific evidence. According to a NIH study, "published and presented data . . . clearly show that formulations intended to deter abuse continue to be abused, including abuse by insufflation and injection."[18] Moreover, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by nonoral routes." Tom Frieden, the former Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids actually reduce rates of addiction, overdoses, or death."

8.     *Promoting the purported efficacy of extended-release ("ER") opioids.*

67.    The Manufacturer Defendants claimed that high-dose, extended-release ("ER"), long-acting ("LA") opioids were superior to lower-dose, immediate-release opioids.

68.    Such claims were contrary to scientific evidence. The CDC has found, based on published research, that there is "a higher risk for overdose among patients initiating treatment with ER/LA opioids than among those initiating treatment with immediate-release opioids." The CDC "did not find evidence that continuous, time-scheduled use of ER/LA opioids is more

---

[18]     Butler SF, Black RA, Fleming AB, *Relative Abuse of Crush-Resistant Prescription Opioid Tablets via Alternative Oral Modes of Administration*, Pain Med. 2018; 19(8): 1613–1627, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6084581/.

effective or safer than intermittent use of immediate-release opioids or that time-scheduled use of ER/LA opioids reduces risks for opioid misuse or addiction."[19]

*9. Criticizing safer alternatives to opioids.*

69. The Manufacturer Defendants made false and misleading claims about the risks of safer alternatives to opioids, such as non-steroidal anti-inflammatory drugs ("NSAIDs"), in order to convince doctors and patients that opioids should be the first-line treatment for chronic pain.[20]

70. Such claims were contrary to scientific evidence. For example, as the CDC has made clear: NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.[21] An independent scientific study in 2018 echoed these findings, concluding that: "[t]reatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."[22]

*10. Promoting opioids to vulnerable populations.*

71. The Manufacturer Defendants falsely claimed that vulnerable populations, such as senior citizens and veterans, faced an equal risk—or were even *less* likely—to become addicted

---

[19] 2016 CDC Guideline, *supra* note 9.

[20] Notably, as a result of the Manufacturer Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing. *See* M. Daubresse et al., *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000–2010*, 51. Med. Care 870–878 (2013).

[21] 2016 CDC Guideline, *supra* note 9, at 12.

[22] Erin E. Krebs et al., *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients With Chronic Back Pain or Hip or Knee Osteoarthritis Pain: The SPACE Randomized Clinical Trial*, 319 J. Am. Med. Ass'n. 872–82 (2018), *available at* https://jamanetwork.com/journals/jama/fullarticle/2673971.

to opioids. They also specifically targeted these populations without disclosing the greater risks to them from opioid abuse.

72.     Such claims and omissions were contrary to scientific evidence. For example, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses. Another study found that veterans were twice as likely as non-veterans to die from an opioid overdose.[23] And yet another showed that veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries.

**B.    Manufacturer Defendants Used Key Opinion Leaders and Front Groups to Push Their Deceptive Messages While Concealing Their Origins.**

73.     The Manufacturer Defendants often concealed the origin (and fabricated the legitimacy) of the deceptive messages described in Section II.A. by funneling them through what they called Key Opinion Leaders ("KOLs") and Front Groups.

        *1.    KOLs.*

74.      Manufacturer Defendants cultivated a small circle of doctors, known as KOLs, who were selected and sponsored by certain Manufacturer Defendants solely because they favored the aggressive treatment of chronic pain with opioids.

75.     KOLs appeared at public speaking events and functions as independent actors, leading doctors and patients to more readily accept their promotional claims about opioids. But KOLs were hardly independent. Rather, certain Manufacturer Defendants often supported KOLs

---

[23]     *Accidental Poisoning Mortality Among Patients in the Department of Veterans Affairs Health System*, Bohnhert AS, Illgen MA, Falea S, McCarthy JF, Blow FC (April 2011) https://www.ncbi.nih.gov/pubmed/21407033.

by paying them to speak at conferences, and paying them consulting fees, travel and lodging expenses, and food and beverage expenses if they continued to tout the use of opioids for chronic pain relief.

76.     The KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present Continuing Medical Education courses ("CMEs"). These guidelines and CMEs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

77.     Two of the most notable (and illustrative) KOLs were Dr. Russell Portenoy and Dr. Lynn Webster.

78.     Dr. Portenoy is the former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York. He received research support, consulting fees, and honoraria from Defendants Teva and Endo (among others).

79.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain.

80.     For more than a decade, Dr. Portenoy gave numerous lectures downplaying the risk of addiction from long-term opioid use. He also served on the Guidelines Committees of American Pain Society ("APS") and American Academy of Pain Medicine ("AAPM") (two "Front Groups"), which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), which

issued education guides for patients, reporters, and policy makers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.

81. Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." These lectures falsely claimed that fewer than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks. Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[24] Dr. Portenoy candidly stated: "Did I teach about pain management, specifically opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[25]

82. Dr. Lynn Webster was the co-founder and Chief Medical Director of Lifetree Clinical Research, a pain clinic in Salt Lake City, Utah, which is now closed. Dr. Webster was President of AAPM in 2013. He is a Senior Editor of Pain Medicine, which published Defendant Endo's special advertising supplements touting one of its opioid products, Opana ER, and authored numerous publications by Defendants Teva and Endo (among others).

83. Dr. Webster was a leading proponent of the concept of "pseudoaddiction," the concept that addictive behaviors should be seen as indications of undertreated pain, rather than a warning sign. As he and co-author Beth Dove wrote in their 2007 book, *Avoiding Opioid Abuse While Managing Pain*, when faced with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."[26] Years later, Dr. Webster reversed this

---

[24]   Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[25]   *Id.*

[26]   Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).

position, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[27]

84.     As of the date of this filing, Dr. Webster—on a website marketing his newest book—still pushes a well-entrenched deceptive message: "[opioids] make life tolerable for so many are also being abused by a much more visible few."[28]

2.     *Front Groups*.

85.     Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to misleadingly promote opioids for the treatment of chronic pain. Under the direction and control of Manufacturer Defendants, these Front Groups generated treatment guidelines, unbranded materials, and programs that touted the benefits of and minimized the risk associated with chronic opioid therapy. The Front Groups also assisted Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with scientific evidence, and by conducting outreach to vulnerable populations targeted by Manufacturer Defendants.

86.     The two most prominent Front Groups were APF and AAPM.

87.     These Front Groups were dependent on the Manufacturer Defendants for funding and, in some cases, for survival. Manufacturer Defendants exercised overt control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination.

---

[27]     John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012, https://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/.

[28]     Dr. Lynn Webster, *Understanding Chronic Pain*, http://www.lynnwebstermd.com/ (last visited July 22, 2019).

88.     For example, Janssen personnel viewed APF and AAPM as, what it called, "coalition members" in the fight to increase market share. Janssen and APF entered into a partnership to "keep pain and the importance of responsible pain management top of mind" among prescribers and patients, working to reach "target audiences" that included patients, pain management physicians, primary care physicians, and KOLs. One of the roles Janssen assumed in the process was to "[r]eview, provide counsel on, and approve materials." Defendant Endo viewed AAPM internally as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. Defendant Endo also provided more than half of the $10 million in funding provided to APF between 2007 and May 2012, when it closed its doors.

89.     Manufacturer Defendants also used Front Groups to work together. For example, Manufacturer Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as a side project of APF. PCF is comprised of representatives from opioid manufacturers (including Endo and Janssen) and various Front Groups, almost all of which received substantial funding from Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which would have reduced prescribing. PCF also worked to address a perceived "lack of coordination" among its members and developed "key" messages that were disseminated in programs and industry-run websites.

### C.     Manufacturer Defendants Pushed Distorted Studies and Biased Treatment Guidelines, While Ignoring Independent Guidelines.

90.     Whether directly or through Front Groups, Manufacturer Defendants, on a number of occasions, promoted (and helped pay for) the publication of treatment guidelines that

supported a more widespread use of their prescription opioid products than contemporary science and medicine justified.

91.    One example includes the Federation of State Medical Boards' ("FSMB") book, *Responsible Opioid Prescribing*. The FSMB Guidelines taught that opioids were "essential" for treatment of chronic pain, including as a first prescription option. The FSMB Guidelines failed to mention risks of overdose, and discussed addiction only in the sense that "inadequate understandings" of addiction can lead to "inadequate pain control."

92.    The FSMB website has described the book as the "leading continuing medication education (CME) activity for prescribers of opioid medications."[29] In a 2012 letter to the United States Senate Finance Committee—which was then investigating prescription opioid abuse—the FSMB stated that *Responsible Opioid Prescribing* had been distributed in all 50 states and the District of Columbia.[30]

93.    Upon information and belief, from 2001 to 2012 the FSMB received at least $370,000 in payments from Defendant Endo; at least $180,000 from Defendant Teva; and at least $100,000 from Defendant Mallinckrodt. Upon information and belief, this included at least $40,000 from Defendant Endo to specifically fund the production of *Responsible Opioid Prescribing*.

---

[29]    The FSMB's current website represents that the book "was developed with the assistance a diverse range of physicians, academicians and health-policy experts and has been used extensively by state regulators and others to address the need for safer, more responsible and better-informed opioid prescribing." "FSMB Foundation Highlights," FSMB, https://www.fsmb.org/fsmb-foundation/foundation-highlights/ (last visited July 22, 2019).

[30]    Letter from Federation of State Medical Boards to U.S. Senators Max Baucus and Charles Grassley (June 8, 2012), *available at* https://assets.documentcloud.org/documents/3109089/FSMB-Response-Letter-to-US-Senate.pdf.

94.     The extent of Manufacturer Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines—the authors of which did not accept drug company funding—reached very different conclusions.

95.     For example, the 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain*, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advised that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommended long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvement in physical and functional status and minimal adverse effects."[31]

96.     Similarly, *The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DoD") in 2010, noted that their review:

---

[31]     Laxmaiah Manchikanti, et al., *American Society of Interventional Pain Physicians (ASIPP) Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).

revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy. Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies. Critical research gaps . . . include: lack of effectiveness studies on long-term benefits and harms of opioids . . . .; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification . . . .; lack of evidence on the utility of informed consent and opioid management plans . . . .; and treatment of patients with chronic non-cancer pain at higher risk for drug abuse or misuse.[32]

97.     Additionally, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the

American College of Occupational and Environmental Medicine, recommended against the

"routine use of opioids in the management of patients with chronic pain," finding "at least

moderate evidence that harms and costs exceed benefits based on limited evidence," while

conceding there may be patients for whom opioid therapy is appropriate.[33]

> **D.     Each Manufacturer Defendant Participated in This Industry-Wide Deceptive Marketing Campaign.**
>
> **1.     *Mallinckrodt.***

98.     Mallinckrodt manufactures, markets, and sells pharmaceuticals including the

following opioids: Xartemis XR, Exalgo, Roxicodone, and Methadose.

99.     Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, and opioids

generally, in a campaign that consistently mischaracterized the risk of addiction and made

deceptive claims about functional improvement. Mallinckrodt did so through a broad array of

marketing channels, including its website, sales force, and unbranded communications, such as

---

[32]     Management of Opioid Therapy for Chronic Pain Working Group, VA/DOD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010), *available at* https://www.va.gov/painmanagement/docs/cpg_opioidtherapy_summary.pdf.

[33]     American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids, (2011), *available at* https://www.nhms.org/sites/default/files/Pdfs/ACOEM%202011-Chronic%20Pain%20Opioid%20.pdf.

those distributed through the "C.A.R.E.S. Alliance" (a service mark of Mallinckrodt), which include unbranded publications that do not disclose a link to Mallinckrodt.

100.    Mallinckrodt retained and paid large sums of money to KOLs to serve as consultants, advisory board members, researchers, and members of its speakers' bureau. Dr. Webster, whom Mallinckrodt paid millions of dollars for research and consulting fees, served on the company's Advisory Board and performed a study on the allegedly abuse-deterrent effects of Mallinckrodt's drugs. Dr. Webster also misleadingly promoted Xartemis on behalf of Mallinckrodt by endorsing the product as abuse-resistant.

101.    Like many of the other Defendants, Mallinckrodt also provided substantial funding to purportedly neutral organizations that disseminated false messaging about opioids. For example, until at least May 2012, Mallinckrodt provided an educational grant to *Pain-Topics.org*, a now-defunct website that touted itself as "a noncommercial resource for healthcare professionals, providing open access to clinical *news, information, research, and education* for a better understanding of evidence-based pain-management practices."[34]

102.    Overall, Mallinckrodt deceptively marketed its opioids including through the following examples:

> a.    *Mallinckrodt downplayed the risk of addiction to opioids.*

103.    In 2012, through the C.A.R.E.S. Alliance, Defendant Mallinckrodt promoted a book entitled *Defeat Chronic Pain Now!*, which included the following misrepresentations, and remains available online:

- "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

---

[34]    Pain Treatment Topics, Pain-Topics.org, *available at* https://web.archive.org/web/20120502042343/http://pain-topics.org.

- "The bottom line: Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

- "Here are the facts. It is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

104.    Until at least May 2012, on its website, *Pain-Topics.org*, Mallinckrodt included a handout titled "Oxycodone Safety Handout for Patients," which advised practitioners that: "Patients' fears of opioid addiction should be dispelled." The handout included several false and misleading statements concerning the risk of addiction associated with prescription opioids, such as: "physical dependence . . . is not the same as addiction . . . Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare."[35]

105.    Mallinckrodt instructed its sales representatives to distribute misleading materials, including the Opioid Safe Use and Handling Guide, which contained numerous misleading statements, including "[a]ddiction does not often develop when taking opioid pain medicine as prescribed under the guidance of a healthcare provider, but it can occur."

      *b.    Mallinckrodt failed to disclose greater risks from prolonged use.*

106.    In 2012, through the C.A.R.E.S. Alliance, Defendant Mallinckrodt promoted a book entitled *Defeat Chronic Pain Now!*, which included the following misrepresentation:

- "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

---

[35]    Lee A. Kral & Stewart B. Leavitt, Oxycodone Safety Handout for Patients, Pain-Topics.Org (June 2007), http://paincommunity.org/blog/wp-content/uploads/OxycodoneHandout.pdf.

- "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy."

    c.    *Mallinckrodt deceptively promoted "pseudoaddiction."*

107.    The FAQ section of Mallinckrodt's website, *Pain-Topics.org*, highlighted the risks of "pseudoaddiction" and "pseudo opioid resistance."

108.    At one time, the Mallinckrodt Policy Statement on Opioids called for a greater understanding of the opioid industry-created myth of pseudoaddiction. These efforts with regard to pseudoaddiction were deceptive and misleading.

    d.    *Mallinckrodt failed to disclose the difficulty of terminating treatment.*

109.    In 2012, through the C.A.R.E.S. Alliance, Defendant Mallinckrodt promoted a book entitled *Defeat Chronic Pain Now!*, which included the following misrepresentation:

"[P]hysical dependence . . . is a normal bodily reaction that happens with lots of different types of medications, including medications not used for pain, and is easily remedied."

    e.    *Mallinckrodt deceptively claimed that opioids improved function and quality of life.*

110.    Mallinckrodt's website, in a section on responsible use of opioids, still claims that the "effective pain management offered by [its] medicines helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."[36]

    f.    *Mallinckrodt deceptively promoted purported abuse-deterrent formulations.*

111.    Mallinckrodt began marketing Exalgo as abuse-deterrent as early as May 2011, deceptively stating "Although once-daily hydromorphone ER can still be misused or abused,

---

[36]    Mallinckrodt Pharmaceuticals, Responsible Use, *available at* http://www.mallinckrodt.com/corporate-responsibility/responsible-use.

these studies indicate that the pharmacological and physical properties of this formulation are performing as designed to make it less susceptible to blood plasma level peaks and troughs and potentially difficult to manipulate."

112.    In 2012, Mallinckrodt misleadingly stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tampering, including chewing, crushing and dissolving."

113.    In 2013, several months before FDA approval of Xartemis, Mallinckrodt began publicizing the alleged "abuse-deterrent" features of the drug, especially through KOL Dr. Lynn Webster. In an interview published online, Dr. Webster stated that Xartemis "has abuse deterrent properties which mean that the new design and technology within this formulation may prevent people who try to manipulate, alter or convert them into an immediate release in order to achieve a greater high." Dr. Webster failed to disclose that he had been paid millions of dollars by Mallinckrodt.

114.    In 2014, after reviewing scientific data provided by Mallinckrodt, the FDA rejected Mallinckrodt's request for abuse-deterrent labeling for Xartemis, concluding that "the results of the studies submitted by [Mallinckrodt] do not meet the standards for [abuse-deterrent] labeling described in the guidance," and that "Xartemis XR is an extended-release Schedule II opioid analgesic with no abuse-deterrent properties."

115.    Notwithstanding the FDA's findings, on March 7, 2014, Mallinckrodt posted a document on its public website falsely stating that Xartemis "is more resistant to simple spoon crushing compared to Percocet" and that "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients."

COMPLAINT - 31

116.    In another example, a document available on *Pain-Topics.org*, entitled

"Commonsense Oxycodone Prescribing & Safety," falsely suggested that generic oxycodone is

less prone to abuse and diversion than branded oxycodone: "Anecdotally, it has been observed

that generic versions of popularly abused opioids usually are less appealing; persons buying

drugs for illicit purposes prefer brand names because they are more recognizable and the

generics have a lower value 'on the street,' which also makes them less alluring for drug

dealers."[37]

2.    *Janssen*.

117.    Janssen played a unique role in the opioid epidemic. Not only did Janssen

manufacture, market, and sell pharmaceuticals—including the opioid drugs Duragesic, Nucynta,

and Nucynta ER—but its parent company (Johnson & Johnson) was a key supplier of the raw

opioid product used by the other drug manufactures to make their opioid painkillers. In fact,

much of Janssen's success in the opioid market was because of its creation of the Norman poppy,

which is a poppy strain that contains the active pharmaceutical ingredient (called "thebaine") that

is used as a starting point in most painkillers.

118.    While moving toward becoming the key worldwide supplier of thebaine, Janssen

also pushed deceptive messages about its own opioid products since the 1990s, and has been on

notice of its perpetually violative marketing since at least 2000. In a letter dated March 30, 2000,

the FDA sent Janssen a letter that its "homemade" promotional pieces were "false or misleading

---

[37]    Lee A. Kral, Commonsense Oxycodone Prescribing & Safety, Pain-Topics.org (June 2007), http://paincommunity.org/blog/wp-content/uploads/OxycodoneRxSafety.pdf.

because they contain misrepresentations of safety information, broaden Duragesic's indication,

contain unsubstantiated claims, and lack fair balance."[38]

119.     That letter identified specific violations, including misrepresentations that

Duragesic had a low potential for abuse:

> You present the claim, "Low abuse potential!" *This claim suggests that Duragesic has less potential for abuse than other currently available opioids. However, this claim has not been demonstrated by substantial evidence.* Furthermore, this claim is contradictory to information in the approved product labeling (PI) that states, "Fentanyl is a Schedule II controlled substance and can produce drug dependence similar to that produced by morphine." *Therefore, this claim is false or misleading.*[39]

120.     Four years later, the U.S. Department of Health and Human Services ("HHS")

sent Janssen a similar letter, following Janssen's continued attempts to use deceptive messages to

promote and sell its opioids. That letter detailed a series of unsubstantiated, false or misleading

claims regarding Duragesic's effectiveness. The letter concludes that various claims made by

Janssen were insufficiently supported, including:

- "Demonstrated effectiveness in chronic back pain with additional patient benefits … 86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep."

- "All patients who experienced overall benefit from DURAGESIC would recommend it to others with chronic low back pain."

- "Significantly reduced nighttime awakenings."

- "Significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index."

- "Significant improvement in physical functioning summary score."

---

[38]     NDA 19-813 Letter from Spencer Salis, U.S. Food & Drug Administration, to Cynthia Chianese, Janssen Pharmaceutica, at 2 (Mar. 30, 2000).

[39]     *Id.*

- "Significant improvement in social functioning."[40]

121.    In the years since, rather than cease its deceptive marketing campaigns, Janssen—like other Manufacturer Defendants—has continued to promote its products with numerous claims that it knows are false or misleading in an effort to increase its market share.

          a.      *Janssen downplayed the risk of addiction to opioids*.

122.    Janssen downplayed the risk of addiction to opioids when it created and maintained the website, www.prescriberesponsibly.com (which remained publicly accessible until at least April 2019). On the website, Janssen stated that while practitioners are often concerned about prescribing opioids due to "questions of addiction," such concerns "are often overestimated. According to clinical opinion polls, true addiction occurs only in a small percentage of patients with chronic pain who receive chronic opioid analgesic . . . therapy."[41]

123.    Janssen also trained its sales force to trivialize addiction risk: a 2009 Nucynta training module instructed that physicians were generally unwilling to prescribe Nucynta and other opioids, but their reluctance was unfounded because the risks were "much smaller than commonly believed."

124.    Although Janssen knew that there was no credible scientific evidence establishing that addiction rates were low among patients who took opioids such as Nucynta to treat chronic pain, it concluded that one of the "drivers" to sell more Nucynta among primary care physicians was the "[l]ow perceived addiction and/or abuse potential" associated with the drug.

---

[40]    Warning Letter from Thomas W. Abrams, U.S. Department of Health and Human Services, to Ajit Shetty, Janssen Pharmaceutica, Inc., at 2 (Sept. 2, 2004).

[41]    Prescribe Responsibly, *Use of Opioid Analgesics in Pain Management*, *available at* http://www.prescriberesponsibly.com/articles/opioid-pain-management.

125.     In *Finding Relief: Pain Management for Older Adults* (2009), Janssen, noting that opioids had been used "for centuries," described the addictive qualities of opioids as a myth: "Many studies show that opioids are rarely addictive when used properly for the management of chronic pain." Janssen claimed some opioids were "less likely to be addictive." The publication disclosed certain minor side effects of opioids, but failed to disclose the material risks of abuse and addiction.

126.     Janssen sponsored the APF publication, *Exit Wounds*, which states, "Long experience with opioids shows that . . . people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." The publication failed to warn of the dangers of taking benzodiazepines with opioids. The publication advised veterans that they "may need to push" doctors "hard" to get their preferred pain treatment.

127.     Janssen deceived prescribers into believing that Nucynta was not like other highly addictive and dangerous Schedule II narcotics, but was more akin to safer, over-the-counter pain medications. Janssen's business plans explicitly called for marketing Nucynta as "unlike traditional opioids" and "less of a gamble" compared to other opioids, with "better tolerability and reduced concern about addiction."

         b.     *Janssen deceptively promoted "pseudoaddiction."*

128.     Like other Manufacturer Defendants, Janssen promoted the false concept of pseudoaddiction. From 2009 to 2011, Janssen, through the APF's website, *Let's Talk Pain*, stated falsely that "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated" and that "[p]seudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

129.    Janssen's website—www.prescriberesponsibly.com—also falsely stated that "many patients often develop tolerance to most of the opioid analgesic-related side effects," and repeats the scientifically unsupported discussion of "pseudoaddiction" as "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically when the pain is treated appropriately, the inappropriate behavior ceases."[42]

       c.    *Janssen failed to disclose difficulty of terminating treatment*.

130.    A Janssen speaker presentation titled *A New Perspective for Moderate to Severe Pain Relief: A Focus on the Balance of Efficacy and Tolerability*, created in March 2011, listed the negative side effects of Nucynta but minimized the risks of withdrawal, misleadingly stating that "more than 82% of subjects treated with tapentadol IR (Nucynta) reported no opioid withdrawal symptoms."

       d.    *Janssen claimed that opioids improved the function and quality of life.*

131.    Janssen misrepresented that opioids create positive long-term outcomes for users with chronic pain. For example, Janssen sponsored a patient education guide titled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. It featured a man playing golf on the cover and listed examples of expected functional improvement from opioids, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It stated that "opioids may make it easier for people to live normally."

---

[42]    Prescribe Responsibly, *Use of Opioid Analgesics in Pain Management*, *available at* http:// www.prescriberesponsibly.com/articles/opioid-pain-management; Prescribe Responsibly, *What a Prescriber Should Know Before Writing the First Prescription*, *available at* http://www.prescriberesponsibly.com/articles/before-prescribing-opioids.

   *e.*   <u>*Janssen falsely promoted abuse-deterrent formulations.*</u>

132.   Janssen promoted Nucynta as crush and breakage resistant to persuade prescribers that Nucynta was less likely to be abused, when that was not true.

   *f.*   <u>*Janssen made misleading claims about safer alternatives.*</u>

133.   In *Finding Relief: Pain Management for Older Adults* (2009), Janssen mischaracterized dose limitations as "disadvantages" of alternative pain management medications.

   *g.*   <u>*Janssen made misleading claims targeting vulnerable populations.*</u>

134.   The Janssen-sponsored AGS Guidelines falsely stated that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse," although the study supporting this assertion did not analyze addiction rates by age.

135.   Janssen co-sponsored the APF publication *Special Considerations: Pain in Specific Populations*. This publication sought to normalize opioid use as a treatment option among the elderly.

   *3.*   <u>*Teva (and Cephalon).*</u>

136.   Teva manufactures, markets, and sells pharmaceuticals, including the following opioids: Actiq, Fentora, and Generic Oxycodone Hydrochloride.

137.   Beginning around 2002, Teva aggressively promoted its opioid products in an effort to help expand the opioid marketplace and reap enormous profits.

138.   This was marked by a concerted effort to convince prescribers that its flagship opioid product, Actiq, was suitable for non-cancer pain, despite the fact that its label has specifically stated: "ACTIQ is an opioid analgesic indicated only for the management of breakthrough cancer pain."

139.    According to "[d]ata gathered from a network of doctors by research firm ImpactRx between June 2005 and October 2006" ("ImpactRx Survey"), sales representatives' visits to non-oncologists to pitch Actiq increased six-fold between 2002 and 2005. Actiq representatives would reportedly visit non-oncologists monthly, providing up to 60 or 70 coupons (each coupon was good for six free Actiq lozenges) and encouraging prescribers to try Actiq on their non-cancer patients.[43]

140.    These efforts paid off. In 2000, Actiq generated $15 million in sales. By 2002, it attributed a 92% increase in Actiq sales to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists." By 2005, Actiq's sales total had jumped to $412 million. By the end of 2006, Actiq's sales had exceeded $500 million.[44]

141.    Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. Results of the ImpactRx Survey suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[45]

142.    According to a Department of Justice press release, Cephalon (now Teva) trained sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs, and funded CMEs to promote off-label uses. Specifically, the DOJ stated: From 2001 through at least 2006, Cephalon was allegedly promoting [Actiq] for non-cancer patients to

---

[43]    John Carreyrou, *Narcotic "Lollipop" Becomes Big Seller Despite FDA Curbs*, Wall St. J. (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292.

[44]    *Id.*; Cephalon, Inc. Annual Report (Form 10-K), at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

[45]    John Carreyrou, *supra* note 43.

use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. Cephalon also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.[46]

143.    On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's. He described the company's successful and "aggressive" launch of Fentora that was persuading physicians to prescribe Fentora for ever broader uses. He identified two "major opportunities"—treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain . . . .

> We believe that a huge opportunity still exists as physicians and patients recognize FENTORA as their first choice rapid onset opioid medication . . . [opioids are] widely used in the treatment of . . . non-cancer patients . . . .

> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and wellbeing and the exciting growth potential that it has for Cephalon.

> In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[47]

---

[46]    Press Release, U.S. Department of Justice, Pharmaceutical Company Cephalon To Pay $425 Million For Off-Label Drug Marketing (Sept. 29, 2008), https://www.justice.gov/archive/usao/pae/News/2008/sep/cephalonrelease.pdf.

[47]    *See* Cephalon Q1 2007 Earnings Call Transcript, Seeking Alpha (May 1, 2007, 8:48 PM EST) at 23, http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript?page=1.

144.    Four months later, the FDA warned: "Fentora should not be used to treat any type of short-term pain."[48]

145.    Nevertheless, in 2008, Cephalon pushed forward to expand the target base for Fentora and filed a supplemental drug application requesting FDA approval of Fentora for the treatment of non-cancer breakthrough pain. In the application and supporting presentations to the FDA, Cephalon admitted both that it knew the drug was heavily prescribed for off-label use and that the drug's safety for such use had never been clinically evaluated.[49]

146.    In the years since, rather than cease its deceptive marketing campaigns, Teva—like other Manufacturer Defendants—has continued to promote its products with numerous claims that it knows are false or misleading in an effort to increase their market share.

147.    The following are specific examples of Teva's more recent deceptive messages.

    a.      *Teva downplayed the risk of addiction to opioids.*

148.    In an article sponsored by Teva, *Appropriate Prescribing of Opioids and Associated Risk Minimization*, KOLs Dr. Steven Passik and Dr. Kenneth Kirsh stated: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-recent work had shown "that opioids do have efficacy

---

[48]    Press Release, U.S. Food & Drug Administration, Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets) (Sept. 26, 2007).

[49]    *FENTORA® (fentanyl buccal tablet) CII*, Joint Meeting of Anesthetic and Life Support Drugs and Drug Safety and Risk Management Advisory Committee, U.S. Food & Drug Administration (May 6, 2008), https://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4356b2-02-Cephalon.pdf.

for subsets of patients who can remain on them long term and have very little risk of addiction."[50]

149.    Teva sponsored APF's "Treatment Options: A Guide for People Living with Pain" (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.

150.    Cephalon sponsored and helped create *Opioid Medications and REMS: A Patient's Guide*, a guidebook that misrepresented the risks of addiction to opioids. The guidebook represented that patients without a history of addiction are not likely to become addicted to opioids. Cephalon circulated the guidebook nationally, and it was available to and intended to reach prescribers in Idaho.

151.    In 2011, Cephalon wrote and copyrighted an article titled *2011 Special Report: An Integrated Risk Evaluation and Risk Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA®) and Oral Transmucosal Fentanyl Citrate (ACTIQ®)*. The article promoted use of Cephalon's drugs by misrepresenting that the "judicious use of opioids can facilitate effective and safe management of chronic pain" and that Fentora had "been shown to be effective in treatment of [breakthrough pain] associated with multiple causes of pain."

    b.    *Teva deceptively promoted "pseudoaddiction."*

152.    In a brochure entitled *Making Pain Talk Painless: A Guide to Help You Talk with Your Doctor about Pain Management*, Cephalon stated that medicine-seeking behavior is not addiction and encouraged patients to talk to their doctor about obtaining more pain medicine.

---

[50]    Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization*, 2 Advances in Pain Management 9 (2008).

153.    Teva sponsored and/or distributed "Responsible Opioid Prescribing" (2007),

which taught that behaviors such as "requesting [opioids] by name," "demanding or

manipulative behavior," seeing more than one doctor to obtain opioids and hoarding are all signs

of pseudoaddiction, rather than true addiction.[51]

        *c.*    *Teva failed to disclose risks associated with higher doses*.

154.    Teva sponsored APF's "Treatment Options: A Guide for People Living with

Pain" claims that some patients "need" a larger dose of an opioid, regardless of the dose

currently prescribed. The guide states that opioids have "no ceiling dose" and insinuated that

they are therefore the most appropriate treatment for severe pain.[52] The guide also counseled

patients that opioids "give [pain patients] a quality of life we deserve."

        *d.*    *Teva deceptively claimed that opioids improve function and quality of life*.

155.    Teva misrepresented that taking opioids for chronic long-term pain provided a

patient with improved quality of life. For example, Teva's Cephalon, through the APF,

sponsored *Treatment Options: A Guide for People Living with Pain* (2007), which was written

for patients and claimed that opioid drugs could give them "a quality of life [they] deserve." The

publication further represented that despite the "great benefits of opioids, they are often under-

used" because providers and patients may be fearful of them.

156.    Cephalon sponsored a CME titled *Optimizing Opioid Treatment for Breakthrough*

*Pain*, which promoted opioids for unsafe uses and misleadingly portrayed the risks and benefits

of using opioids for the treatment of chronic pain. The CME misrepresented that Actiq and

---

[51]    Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at
62.

[52]    Am. Pain Found., *A Policymaker's Guide to Understanding Pain and Its Managemen*t 6
(2011) [referred to as APF, Policymaker's Guide], note 73, at 12.

Fentora, taken in conjunction with long-acting opioids, would help patients regain functionality, improve patients' quality of life, and allow for a more active lifestyle. *Optimizing Opioid Treatment for Breakthrough Pain* was available online.

            4.      *Endo*.

157.     Endo manufactures, markets, and sells pharmaceutical drugs, including the following opioids: Opana, Percodan, Percocet, generic Oxycodone, Oxymorphone, Hydromorphone, and Hydrocodone.

158.     Endo deceptively marketed its opioids including through the following examples:

            a.      ***Endo downplayed the risk of addiction to opioids.***

159.     In 2010, Endo directed its publication manager to reach out to a list of consultants conducting an ongoing Endo-funded study, to assess their willingness to respond to an article[53] that Endo believed emphasized the risk of death from opioids, "without [] fair balance."[54]

160.     Until April 2012, Endo's website for the drug Opana—www.opana.com—contained the following representation: "Most doctors who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted." However, Endo neither conducted nor possessed a survey demonstrating that most healthcare providers who treat patients with pain agree with that representation.

161.     Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain* which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

---

[53]     Susan Okie, A Flood of Opioids, a Rising Tide of Deaths, 363 New Engl. J. Med. 1981 (2010), finding that opioid overdose deaths and opioid prescriptions both increased by roughly 10-fold from 1990 to 2007.

[54]     Endo had a letter written by three of those researchers, but the letters were not published.

162.     Endo also worked with various KOLs to disseminate various misleading statements about chronic opioid therapy. For example, in 2014, Endo issued a patient brochure titled *Understanding Your Pain: Taking Oral Opioid Analgesics*.[55] It was written by nurses Margo McCaffery and Chris Pasero, and edited by KOL Dr. Portenoy. The brochure included numerous false and misleading statements minimizing the dangers associated with prescription opioid use. Among other things, the brochure falsely and misleadingly represented that:

> Addiction IS NOT when a person develops "withdrawal" (such as abdominal cramping or sweating) after the medicine is stopped quickly or the dose is reduced by a large amount. Your doctor will avoid stopping your medication suddenly by slowly reducing the amount of opioid you take before the medicine is completely stopped. Addiction also IS NOT what happens when some people taking opioids need to take a higher dose after a period of time in order for it to continue to relieve their pain. This normal "tolerance" to opioid medications doesn't affect everyone who takes them and does not, by itself, imply addiction. If tolerance does occur, it does not mean you will "run out" of pain relief. Your dose can be adjusted or another medicine can be prescribed.... If you are taking a long-acting opioid, you may only need to take it every 8 to 12 hours, but you may also need to take a short-acting opioid in between for any increase in pain. [56]

163.     The pamphlet also deceptively minimized the risks of addiction by stating that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems," implying that patients who are taking opioids for pain are not at risk of addiction. [57]

164.     Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, APF and NFP, Front Groups for Manufacturer Defendants (including Endo), argued in

---

[55]     Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics*, Endo Pharmaceuticals (2004), http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.

[56]     *Id*.

[57]     *Id*.

an *amicus* brief to the United States Fourth Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.[58]

    b. <u>Endo failed to disclose greater risks from prolonged use</u>.

  165. Endo misrepresented the risk of addiction to opioids on its website, www.opana.com. There, Endo represented that "[m]ost doctors who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

  166. Endo distributed a brochure entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which asked: "If I take the opioid now, will it work later when I really need it?" The answer on the form is "The dose can be increased, you won't run out of pain relief."[59] It further stated that: that (1) "Taking opioids for pain relief is not addiction"; and (2) "Addiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problem."

    c. <u>Endo deceptively promoted "*pseudoaddiction*."</u>

  167. Endo trumpeted the false concept of pseudoaddiction. Endo represented that symptoms of addiction could be remedied by prescribing more opioids. Endo distributed *Avoiding Opioid Abuse While Managing Pain* by KOL Dr. Lynn Webster that claims a doctor should regard aberrant patient behavior as pseudoaddiction and increase the patient's opioid dose to remedy the situation.

---

[58] Brief of the American Pain Foundation, the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz,* No.05-4474 (4th Cir. Sept. 8, 2005) at 9.

[59] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics.* (Russell Portenoy, M.D., ed., 2004).

168.    Endo distributed *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids and hoarding are all signs of pseudoaddiction, rather than true addiction.[60]

169.    Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

> d.    *Endo failed to disclose risks associated with higher doses.*

170.    In April 2007, Endo also sponsored an article aimed at prescribers, written by Dr. Charles E. Argoff in *Pain Medicine News*, titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*.[61] The article downplayed the risks of opioid use for chronic pain, and encouraged prescribers not to give in to any "fear" of prescribing high doses, including by stating the following:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids—the gradual waning of relief at a given dose—and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[62]

---

[60]    Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2007) at 62.

[61]    Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain, Pain Med. News*, http://www.painmedicinenews.com/download/ BtoB_Opana_WM.pdf.

[62]    *Id.*

171.    In 2014, Endo issued a patient brochure titled *Understanding Your Pain: Taking Oral Opioid Analgesics* that misleadingly omitted any description of the increased risks posed by higher doses of opioid medication. Instead, in a Q&A format, the pamphlet asked "[i]f I take the opioid now, will it work later when I really need it?" and responded that "[t]he dose can be increased . . . [y]ou won't 'run out' of pain relief."

    e.    *Endo claimed that opioids improve function and quality of life.*

172.    Through the NIPC, Endo falsely claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," Endo misleadingly touted improved quality of life as a benefit of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

173.    Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "Persistent Pain in the Older Patient." Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

174.    Endo instructed its sales representatives to tell prescribers that opioids would improve patients' ability to function, allowing them to return to work and increase physical activity. For example, Endo distributed a flyer to doctors claiming that use of Opana ER would allow a patient with chronic pain to work as a chef.

    f.    *Endo promoted abuse-deterrent formulations.*

175.    In December 2011, the FDA approved a reformulated version of Opana ER, which Endo claimed offered "safety advantages" over the original formulation because the latter

"is resistant to crushing by common methods and tools employed by abusers of prescription opioids . . . [and] is less likely to be chewed or crushed even in situations where there is no intent for abuse, such as where patients inadvertently chew the tablets, or where caregivers attempt to crush the tablets for easier administration with food or by gastric tubes, or where children accidentally gain access to the tablets."

176.    Endo publicized the reformulated version of Opana ER as "crush-resistant." To combat the fear of opioids, sales representatives touted it to doctors as a safer option due to its crush-resistance and extended-release formulation, even though internal documents show that Endo knew this was not true. In one instance, in October 2011, Endo's director of project management e-mailed the company that had developed the formulation technology for reformulated Opana ER to say there was little or no difference between the new formulation and the earlier formulation, which Endo withdrew due to risks associated with grinding and chewing:

> We already demonstrated that there was little difference between [the original and new formulations of Opana] in Study 108 when both products were ground. FDA deemed that there was no difference and this contributed to their statement that we had not shown an incremental benefit. The chewing study (109) showed the same thing no real difference which the FDA used to claim no incremental benefit.[63]

177.    Nevertheless, Endo's claims about the crush-resistant design of Opana ER also made their way to the company's press releases. A January 2013 article in *Pain Medicine News*, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on the *Pain Medicine News* website, which was accessible nationwide.

178.    Shortly thereafter, the FDA determined that Endo's conclusions about the purported safety advantages of the reformulated Opana ER were unfounded. In a May 10, 2013

---

[63]    *In the Matter of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.*, Assurance No. 15-228, Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 5 (Mar. 1, 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

letter to Endo, the FDA found that the tablet was still vulnerable to "cutting, grinding, or chewing," "can be prepared for insufflation (snorting) using commonly available tools and methods," and "can [be readily] prepared for injection." It also warned that preliminary data suggested "the troubling possibility that a higher percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation."

179.    A 2014 study co-authored by an Endo medical director corroborated the FDA's warning. This 2014 study found that while overall abuse of Opana had fallen following Opana ER's reformulation, it also found that injection had become the preferred way of abusing the drug. However, the study posited that it was not possible to draw a causal link between the reformulation and injection abuse. The study's—and Endo's—failure to adequately warn healthcare providers and the public produced catastrophic results. On April 24, 2015, the CDC issued a health advisory concerning "a large outbreak of recent human immunodeficiency virus (HIV) infections among persons who inject drugs."[64] The CDC specifically attributed the outbreak to the injection of Opana ER, explaining that "[a]mong 112 persons interviewed thus far, 108 (96%) injected drugs; all reported dissolving and injecting tablets of the prescription-type opioid oxymorphone (OPANA® ER) using shared drug preparation and injection equipment."

g.    _Endo made misleading claims about safer alternatives._

180.    Endo distributed the case study _Case Challenges in Pain Management: Opioid Therapy for Chronic Pain_ to prescribers. It described a patient who was using Nonsteroidal Anti-inflammatory Drugs ("NSAIDs") for pain management as having "a massive upper

---

[64]    CDC, Outbreak of Recent HIV and HCV Infections Among Persons Who Inject Drugs, _available at_ https://emergency.cdc.gov/han/han00377.asp.

gastrointestinal bleed believed to be related to his protracted use of NSAIDs" over eight years, and used this information as a reason to recommend opioid based pain treatments without disclosing the serious risks of opioid treatments.

181.    The Endo-sponsored APF publication, *Treatment Options: A Guide for People Living with Pain*, represented that "NSAIDs can cause life-threatening side effects in some persons" and that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines." The publication stated that opioids could be "increased over time" and that there was "no ceiling dose as there is with the NSAIDs," while failing to disclose that opioids pose severe and life-threatening effects and more people die each year from opioid use than from NSAID use.

h.    *Endo targeted vulnerable populations with misleading statements.*

182.    The American Geriatric Society's 2009 Guidelines, which Endo publicized, described the risk of addiction as "exceedingly low in older patients with no current or past history of substance abuse." As another example, an Endo-sponsored CME put on by National Institute for Prevention and Cardiovascular Health, Persistent Pain in the Older Adult, taught that prescribing opioids to older patients carried "possibly less potential for abuse than in younger patients."

183.    Endo also targeted veterans through both misrepresentations and omissions. Endo sponsored the APF publication, *Exit Wounds*, which states, "Long experience with opioids shows that . . . people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications." The publication failed to warn of the dangers of taking benzodiazepines with opioids. The publication advised veterans that they "may need to push" doctors "hard" to get their preferred pain treatment.

E.     **Manufacturer Defendants Targeted Idaho Doctors.**

184.    Each Manufacturer Defendant targeted the public and doctors throughout the country, including in Idaho. Below are select examples of each Manufacturer Defendant's specific efforts to deceptively promote, market and sell its opioid products in Idaho.

1.     *Mallinckrodt.*

185.     Mallinckrodt promoted its opioid products through sales representatives (sometimes referred to as "detailers") who called or visited individual Idaho prescribers. Mallinckrodt kept a list of opioid prescribers it targeted, including more than 100 doctors in Idaho. It had a sales specialist specifically dedicated to the Boise Region.

186.    In 2015 alone, Boise sales specialists promoted Mallinckrodt's opioids to Idaho prescribers through more than 500 calls or visits.

187.    Mallinckrodt used a number of tactics to motivate its sales representatives to sell more opioids in Idaho. This included the Xtra Mile Challenge contest in 2013, which ranked sales representatives on the growth of their Exalgo sales, regardless of patient need. At the end of the challenge, a Boise sales specialist ranked 7th out of over 200 sales reps in the country, based on categories such as "Monthly Average [Total Prescriptions]."

188.    This sales specialist was lauded at a Mallinckrodt sales motivation program as one of the "Top 25 . . . Performing Sales Specialists." The program encouraged Mallinckrodt's sales representatives to "create viral prescribing in an entire office" and "see prescribers weekly." Yet despite being one of the most successful Mallinckrodt sales representatives, the representative's manager reported in his 2014 review that he had encouraged the Boise representative to sell *even more* prescriptions: "We agreed that we had to move forward and build a plan to earn the most dollars possible."

COMPLAINT - 51

189.    Like other Manufacturer Defendants, Mallinckrodt also used KOLs in Idaho to push its deceptive messaging, and held numerous speaker programs throughout the State to promote its opioid products, including in Boise, Meridian, and Twin Falls.

    2.    *Janssen.*

190.    Janssen promoted Nucynta and Nucynta ER through sales representatives (sometimes referred to as "detailers") who called or visited individual Idaho prescribers. Janssen's sales representatives verbally conveyed messages to prescribers in targeted, one-on-one settings, and showed or distributed to prescribers printed or electronic marketing materials promoting Nucynta and Nucynta ER. Between 2009 and 2012, Janssen's sales representatives did this more than 16,000 times in Idaho.

191.    While promoting Duragesic in Idaho, Janssen representatives targeted elderly patients. In one instance, the representative reported that the "objective" of the sales call was to "illustrate [extended-release] as a good option" for the doctor's patients. Regarding addiction, one sales representative reported that an Idaho doctor was "leery of [prescribing] too many opioids due to potential addiction and/or abuse" but they pushed opioids anyway, while assuring him that the representative understands "that abuse is huge to [the doctor] so great niche for tramadol right off the get-go."

    3.    *Teva.*

192.    Teva promoted its opioid products through sales representatives who called or visited individual Idaho prescribers.

193.    In one 12-month period from August 2008 to August 2009, Teva sold more than 10 million opioids in Idaho: nearly seven pills for every man, woman, and child in the State.

194.    Teva targeted Idaho doctors. For example, between September 2008 and February 2009, Teva identified more than seventy-five "High Opioid Writers" in Idaho. Of those, more than 10 were specifically identified as Fentora "A-Targets." An "A-target" was a prescriber selected by Teva as a priority target for sales representatives.

195.    All told, between 2006 and 2015, Teva sales representatives promoted Actiq and Fentora to Idaho doctors more than 1,500 times.

196.    Like the other Manufacturer Defendants, Teva used KOLs in Idaho to promote its opioid products.

    *4.    Endo.*

197.    Endo promoted its opioid products through sales representatives who called or visited individual Idaho prescribers.

198.    In a 2008 presentation, Endo identified Idaho as a region with the highest potential ROI (or Return on Investment).

199.    In 2009, an Endo manager reviewed the performance of an Idaho sales representative who self-reported that his "market share [is] dramatically up" and "all of my top writers are growing in script volume [except one]." Nevertheless, the manager was still not impressed. He wrote: "I want to encourage you to be bold with your top opioid prescribers that haven't gotten onboard in the last two years." He further emphasized: "too many patients could be doing better than they are, they are counting on you to educate and influence the providers."

200.    Endo ranked Idaho doctors by the quantity of their opioid sales and specifically targeted doctors who were top targets and known to prescribe large numbers of opioids.

201.    Endo promoted their opioids through speaker programs in Idaho. Those programs took place throughout the State, including in Idaho Falls, Boise, Coeur d'Alene, and Meridian.

At least one doctor in Idaho was identified as an "Opana Trained Speaker" and "Key Opinion Leader."

202.    Endo encouraged sales representatives within certain "districts" to compete with one another, including in Idaho. In 2012, Endo reported that "Cari in Boise" was an Opana ER District Leader" for selling 111% of the district's goals. In reporting these results, Endo stated that the district's strategies for Opana were to "reclaim lost patients" and "accelerate share acquisition from OxyContin faster than competitors."

III.    **Distributor Defendants Partnered with Manufacturer Defendants, Causing the Flood of Opioids to Continue Unchecked.**

203.    Prescription drugs are distributed through multiple channels before they are ultimately provided to patients. Generally speaking, for retail pharmacy channels, prescription branded drugs are distributed from manufacturer to wholesaler, to retailer (or mail order), and finally to the patient-consumer.

204.    After manufacturers produce and market their drugs, they send their drugs to FDA-registered drug wholesalers for further distribution. Wholesaler distributors purchase, inventory, and sell pharmaceutical products to a variety of providers, including retail pharmacies, and ensure their safe storage and distribution. States, including the State of Idaho, license or authorize wholesalers to sell and distribute pharmaceuticals within their borders.

205.    If the Manufacturer Defendants opened the opioid floodgates, the Distributor Defendants kept the surge at full force. The Distributor Defendants, who had a duty to provide the public with a safeguard against the Manufacturer Defendants' deceptive sales practices, instead turned a blind eye as orders for opioids in Idaho skyrocketed, and even participated in the deceptive marketing campaigns themselves.

A.   **Distributor Defendants Failed to Identify and Report Suspicious Opioid Orders, and Neglected Various Other Legal Duties, Causing Widespread Opioid Diversion.**

206.    Because of their specific and significant dangers, opioids are distributed within a "closed" system under which different entities within the pharmaceutical supply chain are supposed to supervise the discrete links in the chain to reduce the widespread diversion of those drugs outside of legitimate channels.

207.    Because Distributor Defendants handle, and have handled, such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on Distributor Defendants to maintain effective controls to prevent the diversion of these controlled substances.

208.    It is also their legal duty. Under the Federal Controlled Substances Act ("CSA"), its implementing regulations, and the Idaho Pharmacy Act ("IPA"), the Distributor Defendants had a duty to create effective policies to guard against the improper supply of opioids to pharmacies and prevent their widespread diversion.

209.    For example, the CSA requires registrants to (1) report suspicious orders of opioids to the DEA, and (2) perform due diligence before filling any suspicious orders. 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b). Specifically, a "suspicious order" is defined as an "order of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency," and each Distributor Defendant is required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b).

210.    Likewise, the IPA requires that distributors "have adequate processes in place for monitoring the purchase activity of customers and identifying suspicious ordering patterns that

identify potential diversion or criminal activity." Idaho Code § 54-1753. The IPA defines

suspicious ordering patterns as "orders of unusual size, orders deviating substantially from a

normal pattern, orders for drugs that are outside the prescriber's scope of practice, or orders of

unusual frequency." Idaho Code § 54-1753.

211.    Each Distributor Defendant failed to comply with its duties and obligations under

both the CSA and the IPA.

212.    To begin, each Distributor Defendant failed to develop written policies to

adequately guard against diversion. Indeed, their written policies sometimes actually exacerbated

this problem: sales personnel for Cardinal and AmerisourceBergen would warn their customers

(*i.e.*, pharmacies) that they were approaching their monthly threshold limits (a confidential order

limit determined by each Distributor Defendant) for ordering certain categories of controlled

substances. This practice would put a Distributor's sales force in a position to help their

customers evade compliance reviews that would have otherwise occurred by manipulating the

timing and volume of their orders.

213.    Likewise, none of the Distributor Defendants enacted policies that adequately

safeguarded against customers receiving unjustifiable increases in their monthly threshold

allowance for opioid product orders. Instead, those policies directed compliance staff to rely

principally on information provided by the customers themselves in order to justify such

increases, and rarely mandated independent investigation before a threshold limit for opioids

could be increased.

214.    Most consequentially, none of the Distributor Defendants enacted policies that

required customers to be suspended from ordering controlled substances, or terminated entirely,

after those customers had displayed consistent (and even years-long) patterns of making suspicious orders that exceeded their established threshold limits.

215.    This broad failure of the Distributor Defendants to fulfill their explicit statutory duty to create effective anti-diversion policies was then compounded in each case by a common pattern of practical failures, which represented separate violations of the IPA's requirement that they maintain effective anti-diversion policies.

216.    *First*, Distributor Defendants routinely failed to staff their compliance functions with qualified personnel and failed to provide those compliance employees and sales representatives with appropriate training.

217.    *Second*, none of the Distributor Defendants had a consistent practice of conducting appropriate due diligence of either prospective new customers or their existing customers. New customers were routinely onboarded—*i.e.*, added to a Distributor Defendants' controlled substances ordering system—despite the acknowledged presence of unresolved red flags (defined, in industry-terms, as "a circumstance that does or should raise suspicion"), and none of the Distributor Defendants ensured that additional investigations were conducted when existing customers made suspicious orders, even when compliance staff flagged those orders as suspicious, blocked them, and reported them to the State. Indeed, Distributor Defendants routinely allowed their customers to make multiple suspicious orders within the same month, week, or even year, without conducting any additional due diligence on those customers.

218.    *Third*, Distributor Defendants routinely failed to detect and report their customers' suspicious orders for opioids. While Distributor Defendants' policies nominally allowed compliance staff to identify any order as suspicious, as a matter of practice, only orders that exceeded a customer's monthly threshold limit for a particular category of controlled

substances would actually trigger a compliance review. As a result, untold numbers of opioid orders that should have been reviewed due to their unusual size or frequency, or their departure from the customers' normal ordering patterns, were never checked to determine whether they were suspicious. Moreover, even as to orders that exceeded customers' monthly thresholds, Distributor Defendants routinely failed to accurately identify those orders as suspicious. Instead, they released those orders for delivery based on perfunctory and unverified information provided by the customer, or for no documented reason at all.

219.    **Fourth**, Distributor Defendants failed to act to suspend customers from ordering controlled substances, let alone terminate accounts, even after compliance staff had blocked and reported numerous suspicious orders from those customers. In the rare instances where a customer had been terminated or suspended, Distributor Defendants would allow them to reinstate their accounts.

220.    **Fifth**, none of the Distributor Defendants systematically stored, organized, and made accessible for reference information about their customers or their owners, pharmacists, and top prescribers, making meaningful compliance efforts practically impossible. For example, Distributor Defendants did not require compliance staff to obtain customers' prescriber information, and some actually changed their policies to *forbid* such inquiries, willfully blinding themselves to one of the most important indicators of diversion.

221.    **Last**, Distributor Defendants failed to properly report compliance violations to the State of Idaho. Indeed, even when they actually detected failures in their compliance systems, they made no effort to report those known incidents. For example, if the Distributor Defendants had conducted periodic audits of their own records of customers' orders, those customers' patterns of ordering in excess of their monthly threshold allowance for opioid products, the

number of times those orders were released without justification, and the number of times those orders were blocked as suspicious without being reported to government agencies and/or triggering additional investigations, suspensions, or terminations, they would have each been obliged to report hundreds, if not thousands, of CSA and IPA violations at a time.

> **B.     Distributor Defendants Marketed Opioids for Manufacturers in Order to Compete for Distribution Market Share.**

222.     Failure to identify and report suspicious opioid orders was not the only way Distributor Defendants helped cause the opioid epidemic. The Distributor Defendants marketed both branded and generic opioids to pharmacies and, in some cases, health care providers and patients as well.

223.     For years, the Distributor Defendants were paid by the Manufacturer Defendants for their promotion of opioids. Generally speaking, the Manufacturer Defendants provided the advertisements for opioid products to be marketed, and the Distributor Defendants provided the platform for the marketing via their own websites, telemarketing, faxes, and brochures.

224.     All Distributor Defendants assisted with the marketing of one of Janssen's opioid products.

225.     In addition, McKesson specifically offered to provide behavioral coaching services for the Manufacturer Defendants. If a Manufacturer Defendant hired McKesson, then one of McKesson's call center staff trained in behavioral coaching techniques would contact patients directly by telephone to ensure that patients took their medications. On information and belief, McKesson provided behavioral coaching services to the Manufacturer Defendants for their opioid products.

226.     McKesson also ran Behavioral Call Campaigns ("BCCs") pursuant to which McKesson's staff called patients directly to promote adherence to the dosing regimen for specific

drugs. On information and belief, McKesson conducted BCCs for the Manufacturer Defendants to promote their opioid products.

227.     As part of its promotional program, McKesson studied the impact of its coaching services on the length of time that patients take specific drugs. McKesson boasted that its coaching services caused patients to be 25% more adherent to their medications, which according to McKesson, translated to an additional 31 days of taking specific medications.

228.     Cardinal also advertised to the Manufacturer Defendants the availability of Cardinal's promotional services. If hired by a Manufacturer Defendant, Cardinal would provide a variety of services to enable the Manufacturer Defendant to reach physicians with specific specialties.

229.     Cardinal's promotional services offered to the Manufacturer Defendants included programs to train KOLs. Cardinal also offered to provide KOLs who could deliver web-based conference programs promoting a drug manufacturer's products. Further, Cardinal offered a proprietary database of providers to whom the Manufacturer Defendants could send email "blasts" and presentation material to promote its products. On information and belief, Cardinal provided these services to the Manufacturer Defendants to promote opioids sold by the Manufacturer Defendants.

230.     On information and belief, Cardinal sent thousands of emails to pharmacists to promote at least two Manufacturer Defendants' opioid products: Nucynta (Janssen) and Exalgo (Mallinckrodt).

231.     AmerisourceBergen also broadly advertised to the Manufacturer Defendants the availability of AmerisourceBergen's promotional services. If hired by a Manufacturer Defendant,

AmerisourceBergen provided targeted communications to customers through a variety of marketing media to distinguish the Manufacturer Defendant's product.

232.    On information and belief, AmerisourceBergen promoted certain of the Manufacturer Defendants' opioid products.

233.    The Distributor Defendants engaged in marketing efforts for the Manufacturer Defendants despite knowing about high order histories and widespread diversion of these same opioids by consumers in Idaho and elsewhere.

**C.    Each Distributor Defendant Contributed to Opioid Diversion.**

*1.    McKesson.*

234.    McKesson was Idaho's leading distributor of opioid drugs between 2007 and 2014, distributing nearly 150 million pills to its customers in Idaho during that time period.

235.    Over the last decade, McKesson's systems for identifying and reporting suspicious orders have either been wholly inadequate, or completely indiscriminate.

236.    Between 2008 and 2013, McKesson reported virtually no suspicious orders to the DEA. Specifically, of the 1.6 million orders for controlled substances processed between 2008 and 2013 by its Aurora, Colorado Distribution Center, McKesson reported only sixteen as suspicious. Then in 2013, McKesson began to report every order placed in excess of a customer's threshold as a suspicious order. In 2015, for example, McKesson provided the DEA with over 230,000 suspicious order reports, or over 630 per day. McKesson was well aware that this was not an adequate system to disclose suspicious orders to the DEA, as McKesson had previously reported every order in excess of a specified quantity and at that time, was informed that "inundating the local DEA office[s]" was not useful.

a. *McKesson's flawed written policies enabled diversion.*

237. In 2008, McKesson entered in a settlement agreement with the DEA, admitting that—for years—it had failed to maintain adequate controls against diversion, failed to report thefts and losses of controlled substances, and failed to detect and report suspicious orders of controlled substances.

238. Part of that settlement agreement required that McKesson finally establish an anti-diversion policy for all controlled substances—the "Controlled Substances Monitoring Program" ("CSMP"). This CSMP was updated over the last decade, culminating in the current CSMP.

239. McKesson's CSMPs were deficient in numerous ways, rendering them substantially ineffective. Specifically, at various points the CSMPs: (1) directed that customers' monthly threshold limits be set by reference to customers' prior ordering volumes, without requiring investigation of those volumes' appropriateness, effectively setting limits that incorporated prior unmitigated diversion; (2) allowed customers to resolve investigations into orders in excess of their monthly threshold and into requests to increase monthly thresholds by self-reporting the answers to three yes or no questions, without requiring validation of those answers; (3) failed to require key indicators of diversion as part of the company's due diligence of pharmacies, including but not limited to obtaining prescriber-level information; (4) exempted some customers from scrutiny who consistently placed orders in excess of their threshold; (5) alerted customers when they were nearing their monthly threshold limit for opioid products; (6) failed to adequately design and operate a system to disclose suspicious orders to the DEA; and (7) required little to no diligence on chain pharmacy orders, so as to maintain these large customer accounts regardless of the consequences.

240.    These deficiencies (along with others) contributed to the unrestrained flow of opioids to Idaho residents.

241.    McKesson's failure to establish effective controls against diversion is further illustrated by its decision not to require, and later, a directive not to obtain, prescriber information. McKesson did not require pharmacies to provide prescriber-level dispensing data when granting threshold increases or investigating suspicious orders. Even when compliance staff did receive prescriber-level data and identified suspicions about particular pharmacies based on doctors for whom they filled prescriptions, the company lacked any system by which it could identify other pharmacies that filled prescriptions for the same physicians.

242.    Another McKesson policy was to avoid performing diligence on customers that obtained opioids from high-risk pharmacies. McKesson continued to ship opioids to these high-risk pharmacies, continuing to fill their orders up to their thresholds without any diligence at all.

243.    McKesson also employed the practice of alerting customers when they were approaching their thresholds, which had a natural tendency to encourage the manipulation of the compliance system. As a result of this advance-warning practice, McKesson's highest-volume opioid customers, including pharmacies that were later suspended, terminated, or disciplined, were proactively contacted by McKesson's compliance department and distribution center and sales staff so that those customers could structure their orders and justify threshold increase requests, and thereby avoid suspicious order reporting and any additional scrutiny.

244.    In 2017, the DEA determined—and McKesson admitted—that it failed its obligations under the 2008 Settlement Agreement.

b.     *McKesson failed to effectively prevent diversion in practice*.

245.     In addition to adopting ineffective (indeed, counterproductive) anti-diversion policies, McKesson vastly under-resourced its compliance department, assigned unqualified and untrained personnel to implement these policies, routinely ignored these policies in practice, and otherwise failed to take reasonable steps to prevent diversion.

246.     McKesson's lack of attention to its compliance and anti-diversion obligations is evidenced by the *de minimis* resources the company invested in regulatory staff. From 2008 to 2012, implementation of the CSMP for all McKesson pharmacy customers across the country was left to four regional Directors of Regulatory Affairs ("DRAs"). Each of these four DRAs—a number that grew to six in 2012—was responsible for onboarding new pharmacy customers, reviewing and increasing thresholds, and conducting all due diligence for all of the pharmacies across their region, with no other dedicated regulatory staff. DRAs did not receive any designated regulatory staff to assist them until 2014, and the training eventually provided to that staff was inadequate to allow them to perform their jobs effectively.

247.     Also in 2014, supervision over regulatory affairs shifted from the senior vice president of distribution operations, for whom the CSMP had been just one of many responsibilities, to a new head of regulatory affairs, for whom oversight of the CSMP was a full-time job.

248.     Moreover, McKesson provided minimal training to these operations, administrative, and sales personnel with respect to their roles in ensuring the company's compliance with state and federal controlled substances laws and regulations, including the IPA. Senior regulatory staff also did not do audits or even ask for feedback on the CSMPs from these front-line sales personnel.

249.     Finally, as discussed above, McKesson's policies tasked sales staff with front-line compliance duties, without providing any mechanism to ensure that these employees' responsibility and incentive to promote sales did not compromise their ability and/or willingness to perform their compliance-related functions, when doing so could result in the loss of those sales.

250.     McKesson's under-resourced, under-qualified, and untrained staff routinely bypassed critical procedures set forth in the CSMPs and frequently failed to obtain and maintain the records called for by its CSMPs in the due diligence files of its customers.

251.     For example, McKesson employees regularly failed to ensure completion of even the minimal, three-question form used to resolve inquiries into orders in excess of the customer's threshold.

252.     When customers requested increases in their threshold allowance for opioid orders, McKesson routinely approved those increases within days, hours, or even minutes, before any independent, diligent investigation could possibly have been conducted, and without being provided any reasonable justification. On many occasions, McKesson uncritically and immediately accepted the most perfunctory explanations from its customers.

253.     When McKesson did actually conduct additional searching and due diligence investigations than the perfunctory steps discussed above, it routinely failed to identify obvious red flags of diversion.

254.     Finally, even when McKesson actually did identify customers' obvious red flags, it frequently failed to implement suspensions or terminations.

255.    McKesson also routinely failed to report suspicious orders, or orders it blocked, to the DEA. For example, between 2008 and 2017 McKesson blocked approximately 4,300 orders in Idaho that it never reported to the DEA.

256.    Even where McKesson did block customers' orders and report them as suspicious to the DEA, it routinely took no steps to suspend or terminate those customers pending further investigation, and instead simply allowed them to continue receiving their threshold amount of opioids month after month thereafter, regardless of whether the customer continued to make additional suspicious orders.

257.    In each of these cases, instead of suspending or terminating these pharmacies, McKesson continued to supply them with high volumes of opioids, in many cases for years after the risk of diversion they posed should have been obvious.

258.    All the while, opioids flooded Idaho communities. In just one example, between 2007 and 2014, McKesson shipped more than 3.2 million opioids into Idaho County. With approximately 16,000 residents, this amounts to approximately 200 pills for every man, woman, and child. In the same time period, McKesson shipped 2.25 million opioids into 6,000 resident-Bear Lake County—approximately 375 pills per person.

259.    In 2006, McKesson's second "Rank[ed]" customer in Idaho was a Twin Falls pharmacy: it received nearly 650,000 opioids that year. By 2011, the number of opioids shipped to that pharmacy nearly *tripled*: reaching more than 1,600,000 opioids (McKesson's second largest customer in the entire State that year was shipped 840,000 opioids). Despite this dramatic increase, the number of opioids McKesson shipped to that pharmacy between 2012 and 2017 never dipped below 1,500,000.

2.      *AmerisourceBergen*.

260.    AmerisourceBergen is the second largest distributor in Idaho. Between 2007 and 2014, it distributed nearly 80 million pills to its customers in the State.

a.      *AmerisourceBergen's flawed written policies enabled diversion*.

261.    AmerisourceBergen's written policies for compliance with the IPA were and are contained within its Diversion Control Program and its Order Monitoring Program ("OMP"). The programs are administered by AmerisourceBergen's Corporate Security and Regulatory Affairs ("CSRA") staff. From 2007 to 2015, the program's specifics were scattered through a series of policy and procedure documents. AmerisourceBergen implemented a revised Diversion Control Program in 2015 and into 2016. Over the years, the flaws in these policies have enabled the diversion of opioids throughout the country, including in Idaho.

262.    For example, AmerisourceBergen's policies are flawed from the point of initial new customer onboarding. Since 2007, AmerisourceBergen has generally required as part of its new customer due diligence process a customer questionnaire, a site visit, license verification, and online investigation. A central component of AmerisourceBergen's new customer procedure is its Retail Pharmacy Questionnaire ("590 Form"). The form asks for information about other distributors, disciplinary history, customer payment methods, percentages of controlled substances, usage numbers for specific high-risk drugs, and top prescribers of opioids, among other questions. Though the form requests information about prescribing physicians, it is not AmerisourceBergen's policy to perform news searches on those prescribers as part of the new customer procedure.

263.    Staff reviewing the form have high benchmarks for these numbers before considering them red flags.

264.     In another example, AmerisourceBergen does not require new customers to provide usage reports or dispensing data as part of the onboarding process. By relying on these customers to self-report without any documented verification, AmerisourceBergen does not fulfill its obligation of truly knowing its customers' business practices.

265.     In yet another example, both prior to and after program revision, AmerisourceBergen's policies have allowed for frequent threshold manipulation to avoid orders being held for review, rejected from shipment, or reported as suspicious.

                    b.    *AmerisourceBergen failed to prevent diversion in practice.*

266.     At all relevant times, AmerisourceBergen failed to employ sufficient numbers of qualified compliance staff to implement these policies, failed to ensure those compliance staff were meeting AmerisourceBergen's anti-diversion duties, and failed to enforce even the defective policies it had in place.

267.     Many of AmerisourceBergen's compliance violations begin with its new customer policy. The process relies heavily on the customer 590 Form, given that AmerisourceBergen only requests dispensing information from new customers when it already knows of potential issues.

268.     Despite the 590 Form being so critical to understanding its customers and ensuring it can fulfill its regulatory obligations, and despite numerous other AmerisourceBergen procedures relying on reviewing or updating this form, AmerisourceBergen has had significant issues related to failing to perform even this baseline screening.

269.     The one area in which AmerisourceBergen has consistently stood out as compared to its major competitors is its unwillingness to identify suspicious orders, even among customers that regularly exceeded their thresholds and presented multiple red flags of diversion.

COMPLAINT - 68

270.    For example, AmerisourceBergen did not report orders from Idaho customers to the DEA in 2011, 2012, 2016, and 2017.

271.    Nevertheless, in 2011, for example, one Idaho pharmacy was among the top 15 pharmacies nationwide that AmerisourceBergen shipped Mallinckrodt's drugs; that year, it shipped nearly 50,000 opioid pills to that one pharmacy alone. The year before, one Idaho pharmacy was among the top 10 pharmacies nationwide; Amerisource shipped more than 80,000 pills to that one pharmacy alone.

    *3.    Cardinal.*

272.    Cardinal is the nation's third largest drug distributor and was a leading distributor of opioid drugs in Idaho between 2007 and 2014. During that time period, Cardinal distributed at least 65 million opioid pills to its customers in Idaho.

    a.    *Cardinal's flawed written policies enabled diversion.*

273.    Cardinal's written policies for compliance with the IPA were and are contained in Standard Operating Procedures ("SOPs") that apply to its various operating and sales departments. These SOPs were first implemented in December 2008 and have since undergone multiple revisions.

274.    These policies were fundamentally flawed in that they were not coordinated within the context of a consistent, unified umbrella policy to prevent the diversion of controlled substances, resulting in employees governed by one of the SOPs being unaware of the obligations imposed by other SOPs on other employees, even when effective anti-diversion measures required that understanding and coordination. Furthermore, these documents are not readily available even to the employees charged with implementing them.

275.     In addition, Cardinal's SOPs and policies contained numerous gaps that would have prevented them from effectively preventing diversion, even if enforced. For example, these policies: (1) allowed compliance staff to approve onboarding new accounts with no formal mechanism to ensure review and approval by a supervisor; (2) allowed onboarding of new accounts even where customers failed to provide requested information about other suppliers, dispensing data, and top prescriber information; and (3) allowed compliance staff to release a customer's first order in excess of its monthly threshold, regardless of whether the customer made other orders in excess of the same drug threshold at the same time.

b.     *Cardinal failed to effectively prevent diversion in practice.*

276.     At all relevant times, Cardinal failed to employ qualified compliance staff to implement these policies, failed to adequately train those compliance staff or its sales representatives concerning Cardinal's anti-diversion duties, and failed to enforce even the defective policies it had in place.

277.     Cardinal failed to install qualified personnel in key compliance positions. For example, Cardinal's front-line "New Account Specialists" and "Analysts," responsible for onboarding new customers and monitoring existing customers, respectively, were routinely recruited from the ranks of the company's existing pool of administrative assistants. These employees, who had no experience in regulatory compliance, were generally supervised by pharmacists or other professionals with no prior experience in supervising investigative functions.

278.     Moreover, Cardinal failed to provide meaningful training to either these unqualified compliance personnel or sales representatives. Instead, Cardinal expected the compliance staff to "learn on the job" through informal in-person "team meetings." Due to the

lack of proper training and clear guidelines, compliance staff did not fully understand critical components of their jobs and often developed their own procedures and benchmarks for reviewing customers.

279.    Unsurprisingly, these unqualified and untrained staff routinely failed to follow even the most basic procedures required under the company's various SOPs.

280.    In addition, Cardinal allowed customers to reinstate their accounts through the new account onboarding process despite having compliance red flags.

281.    Even to staff charged with investigations and anti-diversion, the message was clear: without sales, there is no Cardinal. Indeed, many of Cardinal's policies and practices have prioritized sales over regulatory obligations.

282.    In 2012 and 2013, Cardinal took significant steps to renew focus on increased sales at the cost of a robust and responsible compliance structure, thereby keeping as customers pharmacies that it knew or should have known were high risk for diversion of opioids. For example, Cardinal: (1) continuously reduced the due diligence information collected from prospective and existing customers, diluting the customer questionnaire, removing the requirements to collect photos of the pharmacies, and ceasing to ask about top prescribers; (2) expanded the geographic scope of investigators with essential regional knowledge of, for example, top prescribers and their locations relative to the pharmacies where their prescriptions were being filled, thus reducing the investigator's efficacy; (3) restricted the information reviewed from site visits by first removing the investigator comment section and for a time eliminating written reports entirely; and (4) demoted, moved to non-compliance functions, or let go several staff members who articulated an interest in expanding the company's compliance

functions, aggressively scrutinizing pharmacy customers, and/or terminating problematic customers.

283.    As to existing customers, Cardinal routinely failed to follow the SOPs for detecting, monitoring, and reporting suspicious orders. For one, Cardinal's compliance staff routinely released orders in excess of a customer's threshold without conducting the follow-up investigation and providing the detailed written justification called for by the SOPs.

284.    Even where Cardinal did block customers' orders and report them as suspicious to the DEA, it routinely took no steps to suspend or terminate those customers pending further investigation, and instead allowed them to continue receiving their threshold amount of opioids month after month thereafter, regardless of whether the customer continued to make additional suspicious orders.

285.    Between 2013 and 2017, for example, Cardinal reported more than 12 opioid-related suspicious orders for at least one year—the equivalent of one per month—for at least twelve separate pharmacies in Idaho. For three of these pharmacies, Cardinal reported an average of one opioid-related suspicious order per month for two or more years. Yet these pharmacies continued to receive their threshold amounts month after month after month.

286.    In one example, between August 2016 and March 2017 Cardinal continued to fulfill one Idaho pharmacy's opioid orders despite eight consecutive months of multiple suspicious orders. Another Idaho pharmacy continued to receive its threshold limit even after placing 30 suspicious orders in a single month.

287.    Finally, even if Cardinal had conducted due diligence to investigate its high-volume opioids customers in Idaho, Cardinal's failure to implement any system to store and

share information about their suspicious customers and/or suspicious prescribers would have compromised the effectiveness of any such investigation.

288.    Due to these flaws, Cardinal routinely continued to supply pharmacies that filled prescriptions for prescribers that had been flagged in its own (infrequent) investigations of other pharmacies as likely sources of diversion.

289.    Despite knowing of the broad failures of its compliance policies, both as written and as actually enforced, and knowing of numerous instances in which those failures had led to individual instances in which the company improperly distributed opioids in Idaho and other states, Cardinal never took meaningful steps toward adjusting its program to better prevent diversion and never told the State (as it was required to) that violations had occurred.

## V.    Manufacturers and Distributors Caused the Opioid Epidemic in Idaho, Harming Idaho and Its Citizens.

290.    The Manufacturer Defendants' and Distributor Defendants' unlawful conduct has foreseeably caused catastrophic harm in Idaho.

291.    In 2017, there were 116 opioid-related deaths in Idaho, up from 56 deaths a decade earlier. (*See* Figure 1 below, showing the number of opioid deaths in Idaho broken down by year.) In the past twenty years, 1,270 Idaho citizens died from opioid-related overdoses. Because 33% of drug overdose deaths during this time did not report the type of drug involved, this number is likely conservative.



(**Fig. 1.**)

292.    The number of opioid-related deaths is rising faster than all other drug-induced deaths in the State, and it is estimated that 62% of all drug-induced deaths in the State are caused by opioids.

293.    The number of Idaho residents addicted to opioids is far greater. There are more than 100,000 Idaho citizens who are chronic opioid users (*i.e.*, individuals who have taken opioids for more than three months without a break of at least one week). This number represents 33% of the total number of Idaho citizens that are prescribed opioids and nearly 6% of the entire State population.

294.    Idaho's opioid addiction rate is higher than that of most other states in the country. Between 2015 and 2016, Idaho ranked 5th among the 50 states for pain reliever misuse among individuals 12 and older.

295.    The Manufacturer Defendants' and Distributor Defendants' conduct caused a proliferation of opioids in the community, which has serious consequences to public health and

safety. In addition to higher incidence of addiction, overdose and death for those who are addicted to opioids, more opioids in the community leads to: (a) opioid diversion, (b) more individuals becoming addicted to illegal drugs, like heroin, and (c) overdoses, death, and harm to individuals who are exposed to the opioids of others, including first-responders, children, adults, and family members.

296.    Opioid addiction carries with it high mortality rates, high incarceration rates, and a high relapse rate for those who seek treatment. Manufacturer Defendants' and Distributor Defendants' unlawful conduct has foreseeably imposed myriad financial costs on the State. One report estimates that Idaho has suffered over $1.5 billion in economic costs and losses from the opioid epidemic, with $150 million in health care costs alone resulting from the opioid crisis, making Idaho the state with the 9th highest per-capita health care costs in the country. Another report estimated the cost associated with each death from an opioid overdose at $9.6 million. With 1,270 opioid-related deaths between 1999 and 2017, the estimated cost in Idaho is more than $12 billion.

297.    Other costs foreseeably caused by the Manufacturer Defendants' and Distributor Defendants' unlawful conduct include: lost productivity, increased health care costs, treatment costs for children born with Neonatal Abstinence Syndrome, increased criminal justice costs, resources for investigations, enforcements, monitoring, and administrative proceedings, increased expenditure of emergency response services, increased costs for opioid-reversal drugs, increased expenditures on social services and government funded or assisted services, increased law enforcement costs, and increased expenditures on treatments, therapies, education, and prevention measures to address opioid addiction, overdose, or exposure, and treatment programs.

298.     The Manufacturer Defendants' and Distributor Defendants' unlawful conduct also foreseeably caused increased costs to the Idaho Medicaid program, which reimbursed millions of dollars each year to providers for Manufacturer Defendants' opioids, as well as the generic versions manufactured by other drug companies. In 2016 alone, for example, Idaho spent over $2 million on opioid prescriptions. But for the Manufacturer Defendants' and Distributor Defendants' unlawful conduct, doctors would not have prescribed, providers would not have dispensed or submitted reimbursement claims to the Idaho Medicaid program, and the Idaho Medicaid program would not have reimbursed providers for as many opioid prescriptions as were in fact prescribed, dispensed, and reimbursed.

299.     Further, the opioid epidemic created and driven by Manufacturer Defendants and Distributor Defendants constitutes a public nuisance, has caused enormous public harm in Idaho, and continues to jeopardize the health and safety of Idaho residents, while interfering with the comfortable enjoyment of life and property. Specifically, the public nuisance that Manufacturer Defendants and Distributor Defendants created violates rights common to the Idaho public. By causing a dramatic and unnecessary influx of opioids throughout Idaho, Manufacturer Defendants and Distributor Defendants have caused widespread opioid abuse, addiction, overdose, injury, crime, and mortality throughout the State. Manufacturer Defendants' and Distributor Defendants' conduct has injuriously affected public rights, including the right to public health, safety, peace, comfort, and convenience, in communities throughout Idaho. Manufacturer Defendants' and Distributor Defendants' conduct has affected, and continues to affect, communities and a considerable number of people.

**First Cause of Action**
**Violations of the Idaho Consumer Protection Act**
**ICPA §§ 48-601, *et. seq.***
**(Against All Defendants)**

300.     Plaintiff hereby realleges all previous paragraphs.

301.     The Idaho Consumer Protection Act ("ICPA") prohibits unfair or deceptive acts

or practices in the conduct of trade or commerce. Idaho Code §§ 48-601, *et seq.*

302.     Idaho Code § 48-603(5) declares that it is unlawful to "represent[ ] that goods or

services have . . . characteristics [or] benefits . . . that they do not have . . . ."

303.     Idaho Code § 48-603(17) declares that it is unlawful to engage "in any act or

practice which is otherwise misleading, false, or deceptive to the consumer."

304.     Idaho Code § 48-603(18) declares that it is unlawful to engage "in any

unconscionable method, act or practice in the conduct of trade or commerce, as provided in

section 48-603C, Idaho Code." Idaho Code § 48-603C in turn declares that "Any unconscionable

method, act or practice in the conduct of any trade or commerce violates the provisions of this

chapter whether it occurs before, during or after the conduct of the trade or commerce."

305.     Idaho Administrative Code § 04.02.01.030 declares that "It is an unfair and

deceptive act or practice for a seller to make any claim or representation concerning goods or

services which directly, or by implication, has the capacity, tendency, or effect of deceiving or

misleading a consumer acting reasonably under the circumstances. An omission of a material or

relevant fact shall be treated with the same effect as a false, misleading, or deceptive claim or

representation, when such omission, on the basis of what has been stated or implied, would have

the capacity, tendency, or effect of misleading a consumer acting reasonably under the

circumstances. With reference to goods or services, this prohibition includes, but is not limited

to, facts relating to the . . . benefit to be derived from the use of the goods or services."

306.    Idaho Administrative Code § 04.02.01.031 declares that "The responsibility for truthful advertising which does not have the capacity, tendency, or effect of deceiving or misleading consumers acting reasonably under the circumstances rests with the seller. Sellers must be able to substantiate all claims or offers made before such claims or offers are advertised. Sellers must maintain sufficient records to substantiate all representations made in their advertisements."

307.    Idaho Code § 48-606 declares that "Whenever the attorney general has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this chapter to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the state against such person: (a) To obtain a declaratory judgment that a method, act or practice violates the provisions of this chapter; (b) To enjoin any method, act or practice that violates the provisions of this chapter by issuance of a temporary restraining order or preliminary or permanent injunction, upon the giving of appropriate notice to that person as provided by the Idaho rules of civil procedure; (c) To recover on behalf of consumers actual damages or restitution of money, property or other things received from such consumers in connection with a violation of the provisions of this chapter; (d) To order specific performance by the violator; (e) To recover from the alleged violator civil penalties of up to five thousand dollars ($5,000) per violation for violation of the provisions of this chapter; and (f) To recover from the alleged violator reasonable expenses, investigative costs and attorney's fees incurred by the attorney general."

308.    The Attorney General has reason to believe that Defendants are using, have used, or are about to use, methods, acts or practices declared by the ICPA to be unlawful and that proceedings would be in the public interest.

309.    Pursuant to Idaho Code § 48-606(3), the Attorney General notified all Defendants of his intention to file this lawsuit. The Attorney General determined that further delay in filing suit would substantially and materially impair the purposes of the CPA and that it was in the public interest to file this lawsuit against Defendants, seeking damages, civil penalties, attorney fees and costs, and injunctive relief.

310.    By committing the acts alleged above, Defendants have violated the above statute and administrative rules.

311.    Defendants knew or should have known that their conduct violated the above statute and administrative rules.

312.    By committing the acts alleged above, Defendants have caused harm to the State and its citizens as described in this Complaint and the Attorney General in the State of Idaho's sovereign capacity seeks legal, equitable, and remedial relief, as provided by law.

**Second Cause of Action**
**Public Nuisance**
**Idaho Code §§ 52-101,** *et seq.*
**(Against All Defendants)**

313.    Plaintiff hereby realleges all previous paragraphs.

314.    Idaho Code § 52-101 defines "nuisance" to include "Anything which is injurious to health or morals, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property."

315.    Idaho Code § 52-102 defines "public nuisance" as a nuisance "which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

316.    Idaho Code § 52-111 provides that "Anything which is injurious to health or morals, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as

to interfere with the comfortable enjoyment of life or property, is a nuisance and the subject of an action. Section 52-111 further provides that the action "may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance."

317.    Idaho Code § 52-205 provides that "A public nuisance may be abated by any public body or officer authorized thereto by law."

318.    By committing the acts alleged above, Defendants created and continue to create a public nuisance by, among other ways, interfering with the comfortable enjoyment of life or property of Idaho citizens as described in this Complaint.

**Third Cause of Action**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. §§ 1961,** *et seq.*
**(Against the Manufacturer Defendants – the "Opioid Marketing Enterprise")**

319.    Plaintiff hereby realleges all previous paragraphs.

320.    At all relevant times, the Manufacturer Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

321.    The Manufacturer Defendants—through the use of "Front Groups," biased publications, KOLs, and sales forces—formed an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities to carry out the common purpose of the "Opioid Marketing Enterprise": to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.

322.    Through its racketeering activities, the Opioid Marketing Enterprise sought to change prescriber habits and public perception about the safety and efficacy of opioid use by convincing them that each of the false propositions alleged earlier were true. In so doing, each of the Manufacturer Defendants knowingly conducted and participated in the conduct of the opioid

marketing activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

323.    Each Manufacturer Defendant worked together to coordinate the enterprise's goals, to conceal their role, and to conceal the enterprise's existence from the public. Specifically, each Manufacturer Defendant coordinated its efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry-friendly and would work together with the Manufacturer Defendants to advance the common purpose of the Opioid Marketing Enterprise; each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

324.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Manufacturer Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the Manufacturer Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Defendants; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise, including between the Defendants and each of the Front Groups and KOLs; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

325.    The persons and entities engaged in the Opioid Marketing Enterprise are systematically linked, upon information and belief, through contractual relationships, financial ties, personal relationships, and continuing coordination of activities, as spearheaded by the Manufacturer Defendants.

326.    The Manufacturer Defendants conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions, and avoid government intervention and regulation, in order to increase the prescription and use of prescription opioids, and expand the market for opioids, all while the State was left to pay for the consequences.

327.    The Manufacturer Defendants each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Manufacturer Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Manufacturer Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail and interstate wire facilities. The Manufacturer Defendants participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

328.    Manufacturer Defendants used, directed the use of, and caused to be used thousands of mail and wire communications in service of their scheme, through virtually uniform misrepresentations, concealments, and material omissions regarding the efficacy of their opioid products to carry out their unlawful goal of selling prescription opioids as scientifically safe and effective, without government intervention.

329.     The Manufacturer Defendants' predicate acts of racketeering (18 U.S.C. §

1961(1)) include, but are not limited to:

- ▪ Mail Fraud: The Manufacturer Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- ▪ Wire Fraud: The Manufacturer Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

330.     Each instance of racketeering activity alleged herein was related, had similar

purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including Idaho consumers, prescribers, regulators and the

State. The Manufacturer Defendants, Front Groups and KOLs calculated and intentionally

crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own

profits remained high. In designing and implementing the scheme, the Manufacturer Defendants

understood and intended that those in the distribution chain rely on the integrity of the

pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific

evidence regarding the Manufacturer Defendants' products.

331.     The Manufacturer Defendants' violations of law and their pattern of racketeering

activity directly and proximately caused the State injury in its business and property. The

Manufacturer Defendants' pattern of racketeering activity logically, substantially and foreseeably

caused an opioid epidemic, both across the country and in Idaho. The State's injuries were not

unexpected, unforeseen or independent.

**Fourth Cause of Action**
**Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §§ 1961, *et seq*.**
**(<u>Against the Distributor Defendants – the "Opioid Diversion Enterprise"</u>)**

332.    Plaintiff hereby realleges all previous paragraphs.

333.    At all relevant times, the Distributor Defendants were and are "persons" under 18

U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial

interest in property."

334.    The Distributor Defendants together formed an association-in-fact enterprise, "the

Opioid Diversion Enterprise," for the purpose of unlawfully increasing the volume of opioids it

produced and sold and for profiting from the attendant increased sales. The Opioid Diversion

Enterprise is an association-in-fact enterprise within the meaning of § 1961.

335.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence

separate and distinct from each of the Distributor Defendants; (b) was separate and distinct from

the pattern of racketeering in which the Distributor Defendants engaged; (c) was an ongoing and

continuing organization consisting of legal entities, including each of the Distributor Defendants;

(d) had sufficient longevity for the enterprise to pursue its purpose; and (e) functioned as a

continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of

the enterprise, including patterns of racketeering activity, and shared in the astounding growth of

profits supplied by unlawfully increasing the volume of opioids they produced and sold.

336.    The Distributor Defendants carried out, or attempted to carry out, a scheme to

defraud federal and state regulators, and the American public by knowingly conducting or

participating in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering

activity within the meaning of 18 U.S.C. § 1961(1), which employed the use of mail and wire

facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

337.     The Distributor Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Distributor Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Distributor Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise.

338.     The Distributor Defendants also conducted and participated in the conduct of the affairs of the Opioid Diversion Enterprise through a pattern of racketeering activity by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

339.     The Distributor Defendants committed crimes that are punishable as felonies under the laws of the United States. Specifically, 21 U.S.C. § 843(a)(4) makes it unlawful for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information from, any application, report, record or other document required to be made, kept or filed under this subchapter. A violation of § 843(a)(4) is punishable by up to four years in jail, making it a felony. 21 U.S.C. § 843(d)(1).

340.     Each of the Distributor Defendants is a registrant as defined in the CSA. Their status as registrants under the CSA requires that they maintain effective controls against diversion of controlled substances in schedule I or II, design and operate a system to disclose to

the registrant suspicious orders of controlled substances and inform the DEA of suspicious

orders when discovered by the registrant. 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

341.    The Distributor Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

include, but are not limited to:

- Mail Fraud: The Distributor Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Wire Fraud: The Distributor Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

- Controlled Substance Violations: The Distributor Defendants violated 21 U.S.C. § 843 by knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the DEA.

342.    The Distributor Defendants aided and abetted others in the violations of the above

laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343

offenses.

343.    The Distributor Defendants hid from the general public and suppressed and/or

ignored warnings from third parties, whistleblowers and governmental entities about the reality

of the suspicious orders that the Distributor Defendants were filling on a daily basis—leading to

the diversion of hundreds of millions of doses of prescriptions opioids into the illicit market,

including into Idaho.

344.    The Distributor Defendants, with knowledge and intent, agreed to the overall

objective of their fraudulent scheme and participated in the common course of conduct to

commit acts of fraud and indecency in distributing prescription opioids.

345.     Indeed, for the Distributor Defendants' fraudulent scheme to work, each of the Distributor Defendants had to agree to implement similar tactics regarding distribution and refusing to report suspicious orders.

346.     The pattern of racketeering activity alleged throughout this Complaint and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, Distributor Defendants are distinct from the enterprise.

347.     It was foreseeable to the Distributor Defendants that the State would be harmed when they refused to report and halt suspicious orders because their violation of the duties imposed by the CSA and Code of Federal Regulations allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market— causing the opioid epidemic that the CSA intended to prevent.

348.     The State's injuries, as alleged throughout this Complaint, were proximately caused by the Distributor Defendants' racketeering activities because they were the logical, substantial and foreseeable cause of the State's injuries. But for the opioid addiction epidemic created by the Distributor Defendants' conduct, the State would not have lost money or property.

**Fifth Cause of Action**
**Negligence**
**(Against All Defendants)**

349.     Plaintiff hereby realleges all previous paragraphs.

350.     Defendants owed a duty of care to the State and its citizens. That duty includes, among other things, an obligation: to conduct its business of promoting, marketing, and/or distributing opioids in compliance with applicable state law; not to make false, deceptive, or misleading statements or claims about its opioids; not to omit material facts and information in

its statements or claims about its opioids; and to take appropriate measures to identify, guard against, and report potential abuse and diversion of its opioids.

351. By committing the acts alleged above, Defendants breached their duty of care to the State and its citizens.

352. Defendants' breach of their duty of care has proximately caused harm to the State and its citizens as described throughout this Complaint.

## DEMAND FOR COSTS AND ATTORNEY'S FEES

353. Plaintiff is entitled to an award of attorney's fees and costs incurred in connection with this matter, pursuant to federal law, including 18 U.S.C. § 1964(c), and pursuant to Idaho law, including Idaho Code §§ 12-117; 12-120; 12-121; and/or 48-606.

## NOTICE OF JOINT AND SEVERAL LIABILITY

354. Defendants are liable for the actions, negligence, and omissions of the other Defendants, jointly and severally.

## NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

355. Defendants' conduct, as alleged herein, warrants an award of punitive damages. Plaintiff intends to seek punitive damages against Defendants in this case, and will comply with Idaho Code § 6-1604.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Defendants as follows:

A. Declaring that Defendants' conduct as described above violates the Idaho Consumer Protection Act and the Idaho Administrative Code;

B. Declaring that Defendants have created a public nuisance within the meaning of Idaho Code §§ 52-101, *et seq*.;

COMPLAINT - 88

C.     Declaring that Defendants' conduct as described above violates RICO;

D.     Declaring that Defendants have acted negligently;

E.     Declaring Defendants jointly and severally liable to Plaintiff;

F.     Permanently enjoining Defendants from engaging in the unlawful conduct described herein;

G.     Ordering the Defendants to disgorge all revenues, profits, and gains achieved in whole or in part through the unlawful conduct described herein and obtained as a result of sales of Manufacturers' products being sold to and used by Idaho consumers and businesses;

H.     Ordering the Defendants to abate the public nuisance that they created and compensate the State for all costs it has incurred and will incur in abating the public nuisance;

I.     Awarding compensatory damages to the State in an amount to be proven at trial, to the maximum extent authorized by applicable law;

J.     Awarding restitution to the State and consumers who were harmed by Defendants' unlawful acts and practices as described herein in an amount to be proven at trial, to the maximum extent authorized by applicable law;

K.     Awarding civil penalties to the State to the maximum extent authorized by applicable law, including the award of treble damages to the extent authorized by applicable law;

L.     Awarding attorneys' fees and costs to the State;

M.     Awarding pre- and post-judgment interest to the State to the maximum extent authorized by applicable law; and

N.     Awarding any and all other relief the Court deems appropriate and just.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury in this matter.

Dated: July 22, 2019

Respectfully submitted,

**LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO**

By: _ /s/    W. Scott Zanzig_____
W. SCOTT ZANZIG
Deputy Attorney General

**LAWRENCE G. WASDEN**
ATTORNEY GENERAL
STATE OF IDAHO

**BRETT DELANGE** (ISB #3628)
Division Chief
Consumer Protection Division

**JANE HOCHBERG** (ISB #5465)
**SCOTT ZANZIG** (ISB #9361)
Deputy Attorneys General
IDAHO OFFICE OF THE ATTORNEY GENERAL
954 West Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho 83720–0010
Tel: 208.334.2400
Fax: 208.334.4151
brett.delange@ag.idaho.gov
jane.hochberg@ag.idaho.gov
scott.zanzig@ag.idaho.gov

**ROBERT S. LIBMAN\***
**DEANNA N. PIHOS\***
**DAVID BALTMANIS\***
MINER, BARNHILL & GALLAND P.C.
325 North LaSalle Street, Suite 350
Chicago, Illinois 60654
Tel: 312.751.1170
Fax: 312.751.0438
rlibman@lawmbg.com
dpihos@lawmbg.com
baltmanis@lawmbg.com

**JAY EDELSON\***
**BENJAMIN RICHMAN\***
**DAVID MINDELL\***
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
jedelson@edelson.com
brichman@edelson.com
dmindell@edelson.com

**RAFEY S. BALABANIAN\***
**EVE-LYNN J. RAPP\***
**TODD M. LOGAN\***
**BRANDT SILVER-KORN\***
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495
rbalabanian@edelson.com
erapp@edelson.com
tlogan@edelson.com
bsilverkorn@edelson.com

*\* pro hac vice*